INDIANAPOLIS WATER CO. v. AMERICAN STRAWBOARD CO.

(Circuit Court, D. Indiana. February 6, 1893.)

No. 8,719.

1. NUISANCE—POLLUTION OF STREAM—INJUNCTION.

The discharge of refuse matter from a strawboard factory into a nonnavigable river, used by a water company owning land fronting on and extending along said river, as a source of supply for furnishing a city, its inhabitants, and others with water for domestic, manufacturing, and other purposes requiring purity of the supply, thereby fouling and polluting such stream, is necessarily a continuing nuisance, for which no plain, adequate, and complete remedy exists at law, and injunction will lie to restrain such discharge.

2. SAME—RIPARIAN RIGHTS.

A water company engaged in supplying a city with water, and owning land bordering on a nonnavigable river, from which a portion of its supply

is derived, and which, for a considerable distance, touches the flow of the stream, is a "riparian proprietor," in the full sense of the word, and as such may perpetually enjoin the deposit in the stream of substances which pollute the water to such a degree as essentially to impair its natural purity.

3. SAME—EQUITY JURISDICTION—REMEDY AT LAW.

In such a case plaintiff has not a plain, adequate, and complete remedy at law, so as to oust the circuit court of jurisdiction, by reason of Rev. St. § 723, providing that suits in equity shall not be sustained in the United States courts in cases where such a remedy may be had at law.

4. SAME—STATE STATUTES.

The federal courts will enforce, either at law or in equity, according to their nature, any new rights created by state statutes, but their equitable jurisdiction of equitable rights cannot be affected by state statutes making such rights enforceable at law.

5. SAME.

Rev. St. Ind. §§ 289–291, defining a "nuisance," and providing that it may be enjoined or abated, and damages recovered therefor, by any person whose property is injuriously affected, are merely declaratory of the pre-existing law, and do not affect the right to proceed in equity in proper cases.

In Equity. Bill by the Indianapolis Water Company against the American Strawboard Company for an injunction. Heard on demurrer to original and supplemental bills. Overruled.

Statement by BAKER, District Judge.

This bill seeks an injunction to restrain the defendant from polluting the waters of White river. It charges that the complainant is a corporation organized and existing under the laws of the state of Indiana, and the defendant a corporation organized and existing under the laws of the state of Illinois; that the company to whose property and rights the complainant has succeeded was incorporated in 1869, and that it then erected in the city of Indianapolis its plant, and began to supply said city and the inhabitants thereof with water for domestic use, for the extinguishment of fires, for use in manufacturing establishments, and other places of business, and for motive power, and for divers other uses, and so continued to do until complainant was organized in 1881; that in 1839–1840 the state of Indiana acquired in fee simple a strip of land 70 feet wide, extending from White river at the town of Broad Ripple, southwest to a point beyond Indianapolis, and thereon constructed the "Indiana Central Canal," and at the same time constructed across the river, at a point below and north of Broad Ripple, a dam to flow water from the river through the canal; that the canal was completed in 1840 to Market street, in Indianapolis, and an arm thereof for water power, from a point just north of Market street, running west and south to a point below Washington street, was also completed at the same time; that the dam, canal, and arm have thence till now been continuously used to flow water from the river at Broad Ripple through Indianapolis, the dam supplying the water head; that the old water company, in 1870, acquired all the right, title, and interest formerly owned by the state in the dam, canal, arm, and waters therein, and the lands upon which they were constructed, and in the water power and mill sites; that for 50 years continuously the successive owners of the canal, etc., have used the water therein for hydraulic power, for supplying water to steam boilers, and other purposes, including the making of ice upon said canal, and supplying water to adjacent ice ponds for making ice for domestic and other uses in and about the city; that for 30 years last past, continuously, said owners have sold to dealers in ice the privilege of taking the ice growing on the canal, and have sold the right to draw water from the canal to fill the ice ponds; that the ice produces large gains to complainant, viz. $4,000 a year, and complainant is, by contracts made many years ago, and having many years to run, bound to flood said ponds for ice making during the ice season; that, up to the time

of the wrongful acts of the defendant complained of, the water in White river, and the water thereof which up to that time had so flowed through said canal, was of sufficient purity for the making of ice suitable for. domestic use, and for all other uses to which ice is put; that in 1882 complainant acquired the fee-simple title to the land bordering upon White river on the east side from Fall creek, north one mile to the La Fayette bridge, and there constructed in said land, in the water-bearing gravel underlying the same, an open filtering gallery or well, 50 feet wide, 25 feet deep, and 1,000 feet long, 14 feet of its depth being below low water, for the purpose of securing pure water for the city and its inhabitants for family and all other proper uses, and connected the same with its works; that in 1890, and before the defendant's works were erected, the complainant erected and equipped an auxiliary pumping station at the gallery, of a daily capacity of 12,000,000 gallons of water, and connected it with the city mains; that the gallery has since 1882 been the source of complainant's water supply, and the river front, gallery, new station, and connections cost complainant over $240,000; that in 1882 the gallery was connected at its northern end to White river by means of filters, so that, when the water collecting in the gallery was insufficient in quantity to meet the requirements of said city and its inhabitants, the same could be supplemented by such quantity of water flowing into said gallery from White river, through said filters, as might be required; that during said time when water has been low and scarce in said gravel bed surrounding said gallery, which occurs at times when there has been continuously dry weather for some time, and when the White river is low, complainant has, as occasion required, so supplemented the water collecting in said gallery, and so continues to do at this time; that complainant owns in fee the land bordering on White river covered by the canal where it heads in the river; also it owns in fee the river front where the gallery is located, extending one mile. It also owns in like manner other lands bounded by White river, and having frontages on said river for the distances hereinafter shown, all situate in Marion county, Ind., up White river from Indianapolis, and down the river from Noblesville.

The bill then describes land fronting on the river at and near Broad Ripple, the frontage shown being over one mile and a half, and all of it except 300 feet being shown to be above the dam; that in order to prevent the deposit thereon of polluting substances, and to preserve the purity of the water flowing into said filtering gallery from the body of water contained in the gravel surrounding said gallery, the complainant has, since the gallery was so constructed, in addition to the other lands hereinbefore mentioned, acquired in fee simple, by purchase, lands lying adjacent to the gallery, aggregating 90 acres, at a cost of $27,000; that the complainant's plant, including the canal, etc., exclusive of operating expenses and repairs, has cost it and its predecessors about $2,000,000; that White river, from Noblesville to Indianapolis, is nonnavigable, and complainant is the only person or company furnishing water to the city and its inhabitants; that late in 1890, without complainant's consent, defendant erected at Noblesville, near the bank of White river, a strawboard factory, and in March, 1891, began to operate it in making strawboard, and has continued to do so ever since; that it discharges from its works into the river 3,000,000 gallons of water each day, which has been used in reducing straw to pulp, and that said water passes down the river, through the canal in part, and, when the stage of water permits, in part over the dam, down the river, alongside of the gallery, over the filters; that defendant uses daily in its process at this factory 80 tons of straw, 27 tons of lime, and 5 gallons of muriatic acid, all of which is worked upon by the water so thrown into the river, and the water as it enters the river is heavily charged with the refuse of all of said materials; that 107 tons of solid matter are thrown into said water each day, and only about 40 tons are taken out, and the remaining 67 tons daily pass into the river; that it is, as it reaches the river, of a dirty brown color, and glutinous in consistency, and has the effect, and has had ever since said works were so started, to render the water of that stream at all points below on White river from Noblesville, to a point somewhere below the city of Indianapolis, which was, before the starting of said works, clear and pure for drinking and other like purposes, brown in color, odorous to the

smell, and impure and unwholesome for drinking and other like purposes; that prior to the starting of the works the river, between the points named, was well stocked with fish, was acceptable for drinking to domestic animals, but since the starting of the works, by reason of the flowing of the water and other matter therefrom into the river, the fish between said points have died, or abandoned that part of the river, and cattle, after tasting it, refuse to drink it, or, if they do drink it, it renders their mouths sore; that the water in the canal is now also amber brown in color, stained with said offal from said mill, and from being of the same degree of purity of the water formerly in the river it has, by reason of said offal, been rendered impure; that, before the strawboard works were started, competent chemists had made repeated analyses of the river water over the gallery and filters, and each analysis showed the water as it flowed in said river to be pure and good for domestic purposes in drinking; that other analyses have been made by the city chemist and by other chemists under the city's employ since the works were started, and they declared that the result showed the water to be less pure than it was before the works were started, and that the impurities were organic and solids held in suspension in the water; that complainant does not know, except as informed, whether the water at that point has been affected to a degree dangerous to health or not, but charges that, if said pollution is allowed to continue, the bed and banks of the river will soon become so befouled with said refuse that the water passing said gallery and through the filters will become unfit, from the presence of said polluting substances, for domestic use, and unfit for admission into said gallery; that repeated chemical analyses by the state board of health of the water flowing in the canal, and in the river, from points at intervals beginning at the head of the canal at Broad Ripple and extending up the river to defendant's works, show that the water now is, and for the last eight months has been, polluted by the presence of the said solid matter so thrown into said river by defendant's said works; that in the spring of 1891 complainant notified defendant that the refuse and offal from its factory were polluting White river to complainant's damage; that the fish commissioner notified defendant that the flowing by it of the polluting substances into the river was harmful to the fish therein, and it must cease; that defendant promised that it would cease to flow said substances into the river, and would put in devices that would remove the same from the water; that complainant depended upon the promise until in the summer of 1891, when, seeing that it was not being performed, it complained of the fouling to the state board of health, and it again notified defendant; that consequently, in September, 1891, defendant asked complainant to refrain from any judicial proceedings for three weeks, by the end of which time it would put in such devices as would remove the polluting substances from the water flowing from its works into the river, and would in that time build a system of settling basins and dams to be constructed in the gravel subsoil underlying defendant's land at its works, so that all of the water from the works would pass in succession into these basins and over the dams; that the promise was not kept, but a cheap makeshift was substituted; that complainant wrote defendant October 17, 1891, that it was still polluting the river, and threatened suit; that defendant wrote in reply to defer any action until it could meet representatives of filter companies; that complainant has been greatly damaged by said unlawful acts of defendant, and it will in the immediate future and thenceforward be more seriously damaged in its business of furnishing water and water power in said city if defendant is permitted to continue, and the acts of pollution are still going on, and defendant will continue them unless restrained.

The supplemental bill charges that a stipulation of record was fully complied with by complainant, and that the devices put in by defendant have removed no appreciable part of the polluting substances from the water flowing from the factory into the river; that the water from the factory, charged with the offal therein of the character, composition, and consistency mentioned in the original bill, again began to flow into the river after the devices were fully completed, and the character of the water and its effect on the river remained the same as when the original bill was filed. The defendant has interposed a demurrer to the original and supplemental bills.

A. C. Harris and Baker & Daniels, for complainant.

J. W. Kern, Geo. Shirts, and Jump, Lamb & Davis, for defendant.

BAKER, District Judge. It is earnestly contended by counsel for defendant that the bill does not show such ownership of the land adjacent to the river as entitles the plaintiff to claim riparian rights in the flow of the stream. It has been well said that the rights of a riparian proprietor, so far as they relate to any natural stream, exist jure naturae, because his land has by nature the advantage of being washed by the stream; and, as the facts of nature constitute the foundation of the right, the law should recognize and follow the course of nature in every part of the same stream. The ownership of the bed of the river is not the foundation of "riparian rights" properly so called, because the word "riparian" is relative to the bank, and not to the bed, of the stream; and the connection, when it exists, of property on the banks with property in the bed of the stream, depends, not upon nature, but upon grant or prescription. Lyon v. Fishmongers' Co., L. R. 1 App. Cas. 662, L. R. 10 Ch. 679. It is necessary for the existence of a riparian right that the land should be in contact with the flow of the stream. All riparian rights depend upon the ownership of land which is contiguous to and touches upon the water. Jones v. Johnston, 18 How. 150; Johnston v. Jones, 1 Black, 209; Bates v. Railroad Co., Id. 204. A mere right of way along the bank, reserved in a grant of land bounded by a river, being a mere easement, would not deprive the grantee of his rights as a riparian proprietor. The grant of a strip of land along the banks, which is contiguous to and touches the flow of the stream, carries with it the ownership of the bed of a nonnavigable river usque ad filum. The bill shows that the plaintiff is the owner in fee of lands which, for a considerable distance, are contiguous to and touch the flow of the stream. It directly avers that it is the owner in fee of a portion of the bed of the stream, as well as of the bank. It is, in the fullest sense, a "riparian proprietor," and entitled as such to all the rights of such proprietor in the water of White river.

A riparian proprietor upon a nonnavigable stream is entitled, in the absence of grant, license, or prescription limiting his rights, to have the stream which washes his lands flow as it is wont by nature to flow, without material diminution or alteration. "Aqua currit et debet currere ut currere solebat." Every riparian proprietor has the right to insist that the stream shall flow to his lands in the usual quantity and quality, and at its natural place and height. He owes the duty of permitting it to flow off his land to the lower riparian proprietor in its accustomed quantity, quality, place, and level. The proprietor has no property in the flowing water, which is not the subject of riparian ownership, but he may use it for any purpose to which it can be beneficially applied, without material injury to the rights of others. Any diversion or obstruction of the water which substantially diminishes its volume, or the depositing of any substances in the stream which corrupt or pollute the water to such a degree as essentially to impair its purity, and prevent its use for any reasonable and proper purpose to which

running water is usually applied, is an infringement of the right of other owners of land through which the stream flows. An action for damages may be maintained by a riparian proprietor for the pollution of a stream. So a perpetual injunction will be granted to restrain such pollution, especially if it is of a continuous nature, even when the plaintiff could only recover nominal damages at law, because of the inconvenience of repeated actions, and the danger of the acquisition of an adverse right to pollute it by its continuance for 20 years. So, also, a perpetual injunction will be granted to restrain the pollution of a stream where the nature of the injury is such as to render it difficult or impracticable to adequately measure the damages, and fully compensate for the wrong. Gould, Waters, (2d Ed.) § 223. and cases cited in note 1; Merrifield v. Lombard, 13 Allen, 16; Lyon v. McLaughlin, 32 Vt. 423; Holsman v. Spring Bleaching Co., 14 N. J. Eq. 335; High, Inj. (3d Ed.) §§ 749-795.

The contention that the bill does not charge such tortious injury as entitles the plaintiff to relief is unfounded. The injury alleged is not contingent, remote, or speculative. It is distinctly charged that the defendant daily passes through its factory 3,000,000 gallons of water, and uses 80 tons of straw. 27 tons of lime, and five gallons of muriatic acid, all of which are worked upon by the water passing through the factory which is discharged into the river; that 107 tons of solid matter are thrown into said water each day, and only about 40 tons are taken out, and the remaining 67 tons daily pass into the river; that the water passing through the factory, as it reaches the river, is of a dirty brown in color, and glutinous in consistency, and has the effect, and has had ever since the works were started, to render the water of the stream at all points below on White river from Noblesville, to a point somewhere below the city of Indianapolis, which was, before the starting of said works, clear and pure for drinking and other like purposes, brown in color, offensive to the smell, and impure and unwholesome for drinking and other like purposes; that prior to the starting of the works the river was well stocked with fish, and was acceptable for drinking to domestic animals, but since the starting of said works, by reason of the flowing of the water and other matter therefrom into the river, the fish between said points have died, or abandoned that part of the river, and cattle, after tasting it, refuse to drink it, or, if they do drink it, it renders their mouths sore; that the water in the canal is now also amber brown in color, stained with said offal from said mill, and from being of the same degree of purity of the water formerly in the river it has, by reason of said offal, been rendered impure. These facts clearly show actionable injury to plaintiff's riparian rights. The bill also shows that the plaintiff has been and is suffering, and will continue to suffer, material pecuniary injury from this infringement of its rights. The extent of its pecuniary injury from the nature of it, and from the extent and character of the uses to which plaintiff devotes the water, is incapable of any certain admeasurement; but if the plaintiff had neglected to use or appropriate

the water, or had as yet suffered but small pecuniary loss, it would not present any such impediment as would warrant a court of equity in refusing relief. Nor could the fact that the defendant would be exposed to great difficulty and expense to restore the water to its accustomed purity present such objections as would justify the court in denying equitable relief. High, Inj. (3d Ed.) 795, and cases there cited. Courts will not interpose by injunction to prevent a mere eventual or contingent nuisance, nor will they interpose when the injury is remote or contingent, and rests merely in speculation. A very strong case must be made by the bill to justify the court in granting injunctive relief; and, if there is reasonable doubt of the effect of the alleged nuisance on the construction of the facts alleged in the bill, there will be no interference until the matter is tested by actual experience. These principles, however, do not rule the facts exhibited in the bill. The bill shows the wrongful corruption of pure and wholesome water, so that it has become offensive to sight and smell, and deleterious in use for ordinary domestic purposes. It clearly discloses an actionable wrong.

It is further claimed by the defendant that the court cannot take jurisdiction of this bill because the plaintiff has a plain adequate and complete remedy at law for the injuries complained of. Section 723, Rev. St. U. S. 1878, provides that "suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law."

It is argued that, if this suit was pending in a state court in Indiana, there would be no doubt that a court of equity would not have jurisdiction to interfere by injunction, because the legislature of the state has provided a plain, adequate, and complete remedy at law, and it is asserted that, inasmuch as this suit would be triable at law in a state court, it must be tried at law in this court. It is undoubtedly true, if the customary or statute law of a state has created a new right, the federal courts will enforce the same at law or in equity, if it falls within the remedies authorized by either branch of their jurisdiction. Gaines v. Fuentes, 92 U. S. 10; Ellis v. Davis, 109 U. S. 485, 3 Sup. Ct. Rep. 327; Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. Rep. 712. Such new rights, however, will be enforced at law or in equity, as the nature of those rights may require. The state cannot bind the federal courts by limiting the remedy so as to impair the separation established by the constitution between actions for legal demands and suits for equitable relief. Scott v. Neely, supra.

But, independently of this consideration, the statute of the state does not affect the question of jurisdiction of such a cause of action as is exhibited in the bill, whether brought in a court of the state or in this court. The sections of the statute of the state cited and relied on are 289, 290, and 291. These sections are as follows:

"289. Whatever is injurious to the health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. 290. Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is less-

ened by the nuisance. 291. Where a proper case is made, the nuisance may be enjoined or abated, and damages recovered therefor."

These sections create no new rights, nor do they prescribe any new remedy. The first two sections simply codify the law of nuisance as immemorially adjudged by the courts and stated in text-books. The remedy by injunction or abatement was known and practiced by the courts of this state long before the Code of 1852 was enacted. It simply recognizes the jurisdiction of courts of equity to enjoin a nuisance, or, after a judgment at law, to order it to be abated. While all legal and equitable rights were by the Code required to be enforced by a "civil action," and while such action, whatever its nature, was triable by jury as an action at law, such practice never obtained in this court, and since 1881 it has not obtained in the courts of this state. Rev. St. Ind. 1881, § 409. Since the enactment of the last-cited statute, issues of law and of fact in suits of equitable cognizance have been triable by the court without the aid of a jury.

The question whether a suit shall be tried by the court sitting as a chancellor is now to be determined, both in the courts of the state and in this court, by the inquiry, has the plaintiff a plain, adequate, and complete remedy at law for the redress of the grievances alleged in his complaint? Suits in equity can only be brought when the court can give more complete and effectual relief in kind or degree on the equity side than on the common-law side. Where the right of a riparian proprietor to the use and enjoyment of the flow of a stream of pure and wholesome water, free from corruption and pollution, has been actually invaded, and such invasion is necessarily to be continuing, and to operate prospectively and indefinitely, and the extent of the injurious consequences is contingent and of doubtful pecuniary estimation, the writ of injunction is not only permissible, but it affords the only adequate and complete remedy. High, Inj., supra; Lyon v. McLaughlin, 32 Vt. 423; Merrifield v. Lombard, 13 Allen, 16. The bill shows a clear invasion of the plaintiff's rights, and that the invasion is necessarily to be continuing, and to operate prospectively and indefinitely, and that the extent of the injurious consequences is contingent, and impossible of accurate pecuniary estimation. An action at law would afford no plain, adequate, and complete remedy for the injuries complained of. The demurrer must be overruled, and it is so ordered.