JULIUS NORTON *v.* JOEL VOLENTINE.

The proprietor of land, through which a stream runs, may obstruct the natural channel, and divert it into any portion of his land, if the water be returned into the former channel before it passes upon the land of another.

The owner of the land below can maintain no action for any such obstruction or diversion until he is injured thereby, and, until that time, no prescription runs in favor of the continuance of such obstruction.

But if, in such case, the new channel be obstructed so as wholly to divert the water from the land below, the proprietor below may maintain an action for such obstruction of the new channel, and that against the grantee of the owner of the land, at the time of the original diversion, and without any request to remove the original obstruction.

It would seem that one who cuts a canal through his own land, and erects mills, and diverts a portion of a stream from its accustomed channel upon the land of another, and is suffered to do this by the proprietor below for fifteen years, thereby acquires the right to do it.

*Quære.*—How far does he thus oblige himself to continue such artificial flow of water?

THIS was an action on the case for diverting and turning away the water of a certain stream, or water course, in Bennington, on which the plaintiff had a factory for the manufacturing of stone ware and fire brick, by means of which the plaintiff was deprived of sufficient water to work his factory.

Plea, not guilty.

In the county court, the cause was referred, and the referees, having heard the testimony introduced by the parties, afterwards reported as follows:—

'On the trial of this cause before the referees, it appeared
'that the plaintiff owned a factory for the manufacturing of
'stone ware and fire brick, in East Bennington, upon a small
'stream of water, and that the defendant owned a woollen
'factory, situated on the same stream above the plaintiff's
'factory; that the land of the defendant adjoined that of the
'plaintiff; that the water is conveyed to the defendant's fac-
'tory from a dam across the stream, a few rods above his
'factory, through a flume and race-way, passes under the
'factory building and then through a narrow artificial chan-
'nel into the natural channel, in which it runs upon the land
'of the plaintiff to his factory; that the factory of the de-
'fendant was first built, and was erected in 1823; that, pre-

'vious to the year 1814, the stream divided a short distance
'below the present dam, and a portion of the water passed
'off in what is now the north channel, but the largest portion
'of the water ran in the natural channel, now called the
'south channel, and entered the land of the plaintiff where
'it now does; that, about the year 1814, in a high freshet,
'the south branch broke through the barrier between that
'and the north branch, a short distance below the place
'where the stream had previously divided, and, after that,
'until the year 1823, the largest portion of the water ran in
'the north branch; and when the water was very low the
'whole of the water, by menns of temporary obstructions
'placed in either channel, was occasionally turned into the
'other for the purpose of irrigating the meadow, &c.; that
'in 1823, the factory, now owned by the defendant, was
'built by the Messrs. Saffords; that previously to the erec-
'tion thereof they (Saffords) filled up the south channel of
'the stream, from the place where the stream divided,
'to a point several rods below, and constructed the
'present dam, flume and race-way, for the purpose of
'conducting the water to the factory, so that the wa-
'ter was made to run in this flume and race-way south of
'the south channel, on to the wheel in the defendant's fac-
'tory, and then passed off under the building and entered
'the natural or south channel and passed therein on to the
'defendant's land, and thence to the plaintiff's factory, and
'has so continued to run ever since, except when prevented
'from so running by the defendant; that, after the month
'of June, 1825, the defendant had occasionally stopped the
'water at the flume and turned the whole of it off from the
'plaintiff's land for a short time, when the defendant did not
'want to use it; that it did not appear that the water was
'turned off so as to injure the plaintiff until 1835, after the
'plaintiff had erected his works, when the defendant claimed
'the right to stop the water at the flume and prevent its run-
'ning on the plaintiff's land when he pleased, and refused
'to let it run on to the plaintiff's land, by means of which
'the plaintiff's works were stopped, and he sustained dam-
'ages.

'The defendant contended that, inasmuch as he turned
'the water into its natural channel by stopping the water at

' the flume, and as the natural channel was filled up for sev-
' eral rods, and the artificial one made before he purchased
' the factory, and without his agency, he was not responsible,
' even though the plaintiff had sustained damages in conse-
' quence of the stopping of the water.

' But the referees, intending to decide according to law,
' decided that the plaintiff had a right to have the water run
' on to his land from the land of the defendant, in its natural
' channel, and that the defendant had no right wantonly to
' stop the water from running to the works of the defendant
' in the channel in which it run previous to 1814, and since
' 1823, and that the alteration of the course of the water on
' the land of the defendant, by filling up the old channel and
' making the new one, made no difference with the rights of
' the plaintiff, or the liability of the defendant, whether that
' alteration was made by the defendant, or those of whom he
' purchased. It appeared that the defendant purchased the
' factory on the 28th of October, 1824.

' It also appeared that the land upon the bank of the river
' where the south channel was filled up, was owned by John
' Norton until the year 1829, when it was purchased by the
.' defendant ; but it had been occupied by the defendant from
' the time when he purchased the factory, as is before stated,
' and had also been occupied by those of whom he pur-
' chased from the time they commenced building, in 1823.'

The following plan shows the situation of the plaintiff's
and defendant's factories, and of the stream upon which they
stand :

The county court accepted the report of the referees, and
rendered a judgment thereon for the plaintiff, and the de-
fendant excepted to the decision.

*P. Isham* and *W. S. Southworth*, for defendant.

From the facts found by the referees, it appears that the defendant came into possession of his factory in 1824, and found the stream running in the north channel, and the water conducted from the stream by means of a dam, flume, and artificial ditch, to his factory, and that from June, 1825, to the commencement of this suit, he has exercised the privilege of turning the water into the stream whenever he deemed it necessary.

Although it is found that the south channel was the ancient bed of the stream, yet, it is also found that, in 1814, the stream broke through its bank, and after that period ran in the north channel, where a part of the stream had always run ; and that for twenty-five years before the commencement of this suit, all parties had acquiesced in that course of the water.

This alteration of the course of the stream, by natural causes, with the acquiescence of all concerned for that period of time, has rendered the north channel the natural bed of the river ; and it is the plaintiff's fault if he has erected his works away from its natural channel. 3 Stark. Ev. 1671. 2 Conn. R. 584.

The exercise of the privilege for that length of time will give one the right to flow back water upon the land of another. 7 Cow. Rep. 286. 9 Cow. Rep. 279. So one may acquire the right in the same time to diminish the quantity of water which descends to those below. 1 Barn. & Ald. 253. 2 Aik. Rep. 266. 1 Sim. & Stu. 190, 203.

In 1823 the south branch was filled up by *Safford*. From that period to the commencement of this suit, being 16 years, and from thence to the present time, the whole stream has been turned into the north channel. Now fifteen years not only gives the right, but makes it the duty of all to cause the stream thus to flow, and those who hereafter may build on the north channel can object to any interruption of that course of the water. Fifteen years has also given to the defendant the right of drawing the water from the stream through his ditch to his factory, and this right is co-extensive with the use. 13 Mass. Rep. 507, 514. 2 Cowen's Phil. Ev. 382.

The act complained of in this case is one for which no

action can be maintained. For the effect of shutting down the gate at the head of the ditch was to *turn the water into the natural channel;* and the defendant *has done no act to prevent* the stream from running down the south channel, if it of right should run there. The obstructions were placed there by others, and before he purchased or came into possession of the premises, and no liability can be imposed on the defendant, at least until after he has been requested to remove them. The principle in relation to nuisances applies. He who erects a nuisance is liable for all damages sustained ; but if he sells, the purchaser is not liable *until after a request to remove it.* 1 Chit. Pl. 71. 2 Chit. Pl. 587, note y. Cro. Jac. 555. 5 Co. Rep. 100. (Ab. 176.) Angell on Water-courses, 100.

Although the defendant may have the right to draw water from the stream to operate his machinery ; yet, he has the right to abandon it. And one, by building below him, and taking the water from his raceway, cannot impose upon him the obligation in perpetuity of keeping the dam in repair, when not wanted for his own use. Gale & Whately on Easements, 126, *Arkwright* v. *Gell,* 130. Ib. 290, 291.

*J. S. Robinson* and *A. P. Lyman* for plaintiff.

1. The question arising upon this report is, whether, upon the facts found by the referees, they erred in point of law, in deciding that the plaintiff was entitled to recover. It appears from the report that the plaintiff and defendant were adjoining proprietors of land through which a stream of water runs. What are the rights of these riparian proprietors ? By the decision of this court in the case of *Davis* v. *Fuller,* 12 Vt. Rep. 178, the defendant would be liable for the diversion of the water from the plaintiff's factory, if an actual damage ensues to any material amount, unless the defendant had acquired, by grant or prior uninterrupted enjoyment for the period of fifteen years, the right to use the water as claimed or asserted by him. The referees did not find either a grant or prior occupancy for the requisite period of time. The case then of *Davis* v. *Fuller* is decisive of the rights of these riparian proprietors, unless the additional facts reported by the referees should except this case from its operation.

2. It is contended that the additional facts reported do not vary the legal rights of the parties. The referees find that the natural channel of the stream, previous to its being filled up, conveyed the water upon the land of the plaintiff where it now does by the dam, flume, and raceway built by the defendant, or those under whom he claims.

Consequently, the plaintiff's right to have the water flow down in its ancient and natural channel, when it enters his land, is not affected by the alteration of the channel upon defendant's land. The law gives to the proprietor above the right to use the water either in the natural channel, or an artificial one, but he must return it to its ordinary channel when it leaves his estate. 3 Kent's Com. 429.

3. The defendant contends that he is not liable, since the south channel upon his land, from the place where the stream divided, to a point below, was filled up by his grantor, and when he shuts the gate at his flume the water passes down the north channel. But the liability of the defendant is the same, whether the injury is occasioned by his own acts or those of his grantor. It is immaterial in what manner the plaintiff is deprived of the water, whether by filling up the natural channel by deft's grantor, or shutting the gate at his flume ; if the former, he is liable for the continuance of the obstruction in the natural channel. Gale & Whately's law of Eas. 188. N. B. 124. 10 Mass. 72. Angell on Water-courses, 184 and 83.

The opinion of the court was delivered by ·

REDFIELD, J. — The only questions of law which can be raised, either in this court, or the county court, in a case like the present, are those which are expressly decided by the referees, and which may be supposed to have affected the final determination of the case by them.

There has been considerable said, at the bar, upon the question, how far the grantee of land, upon which the grantor had placed obstructions in a running stream of water, is liable for the injurious consequences to others, owning land on the same stream. It seems to be admitted, on all hands, that such grantee may be made liable for the continuance of such obstructions, after reasonable notice to remove them ; but the question made here is whether he is liable without

such notice. The case of *Penruddock,* 5 Coke R. 101, goes
upon the ground that in no case is the grantee liable for such continuance until after notice and request to remove. That
case makes no distinction whether the obstructions are for constant use, like a dam, and where each new act of use would seem to be equivalent to a positive erection of the original obstruction, and thus to preclude the necessity of a special request, and obstructions which are casual, or from neglect, and in no sense connected with the positive use of the land, like throwing dirt or rubbish in a stream of water, to get rid of it, as is sometimes done. There would seem to be more justice in requiring a special request in the latter than in the former case. But in a late case in Connecticut, *Johnson* v. *Lewis,* 13 Conn. 306, the doctrine of the case cited from 5 Coke is applied to the case of a mill-dam, which is as strong a case as could well be put. The distinction between obstructions for use and those of a different character, is rejected, and Penruddock's case sustained to the full extent. From some of the elementary books upon pleading, I apprehend, that in declaring against an assignee or grantee in such cases, it has been usual to allege a special request. 1 Chit. Pl. 74. 2 Ib. 333, n. (c.) *Tomlin* v. *Fuller,* 1 Mod. R. 27. If it were necessary to decide this case upon this point, I am not at present prepared to go the length of the old cases, nor that in Connecticut; still less am I prepared to say they are not well founded. We think no such question was, or from the facts in the case could have been, raised. The obstructions placed in the north channel, by Safford, in 1823, produced no injurious effects upon defendant until 1835, when plaintiff caused the water to be shut off at his flume, and thus turned all the water off from defendant's land and rendered his factory useless.

It is a well settled principle, that a servient proprietor of land cannot complain of any use which the dominant proprietor may make of the water in a stream, so long as he is not sensibly affected by that use. The dominant proprietor may divert the water from its usual channel, but if it is returned to the same channel before it reaches the land of the next proprietor below, no one can complain. But if the water is diverted into a new channel, and then the new channel obstructed, so as to carry off the water wholly in an-

other direction, from that time a right of action accrues to the servient proprietors affected by it. And no prescription begins to run until a right of action accrues, and no right of action accrues until injury is inflicted. Hence it is obvious that no right of action would accrue to plaintiff, until the water was shut off by defendant, at his flume. If this were not so, the plaintiff's cause of action could have been barred before it accrued. The defendant might open and shut his gate when he pleased, because it was a mere private sluice or canal. He might continue the obstructions in the old channel, because they had been suffered to remain there more than fifteen years. The absurdity of such a proposition is apparent.

We do not consider it necessary to discuss the question, how far a proprietor of land below defendant's mill, and who had received the waste water upon his land at a new point, (and not in the old channel,) and who, in faith of its continuance, erected mills, or machinery, and this had continued for fifteen years, could insist upon the continuance of the flow of the stream in its new channel. It is a case wholly dissimilar to the present one. And it is a case not without difficulty. The case of *Arkwright* v. *Gell*, Gale & Whately on Easements, 126, 130, is one, I think, which does not precisely involve this question. That case seems to have been decided upon the very ground that the flow of water, being from the use of mines, was, in its very nature, temporary, and must have been so understood by both parties. The discharge of an eave-spout, or the drainage of lands, or mines, or any other temporary flow of water, and where positive and artificial means were necessary to keep up the stream, if continued for more than fifteen years, might give the right to the dominant owner to flow the water upon the land of the servient owner. For the acquiescence in what would be a nuisance, unless done by permission, for the term of fifteen years, will, in law, raise a presumption of a grant. But when this is for the benefit of the person doing it, and he has to make use of positive means to continue it, no presumption whatever arises that he has contracted to continue it. In the cases supposed, every reasonable man would expect the owner to remove his eave-spout, or his

house even, to discontinue the drainage of his land, or of his mines, at will.