RANNEY, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY et al., Appellants.

St. Louis Court of Appeals, May 11, 1909.

1. RAILROADS: Lateral Drains: Surface Water. Under section 1110, Revised Statutes 1899, if a railroad bed obstructs the flow of water, surface water as well as other, the railroad company maintaining it must provide lateral drains to carry it off, if there is a watercourse, ditch or drain into which the lateral drains may be made to flow.

2. ———: ———: Prima-Facie Case. In an action against a railroad company for failure to construct lateral drains and the consequent overflow of plaintiff's land caused by its embank-

ment, the evidence is examined and held sufficient to make out a prima-facie case showing that there was a watercourse or ditch with which the lateral drains could be connected so as to prevent the damage.

3. ———: ———: **Private Ditches.** Ditches dug by farmers across the line of a railroad track for the purpose of draining their farms are not ditches, drains or watercourses with which the railroad company was obliged to connect lateral drains required by section 1110, Revised Statutes 1899. In an action against a railroad company for damages to the plaintiff's farm, caused by the failure to construct lateral drains, the defendant was not estopped to say that there were no ditches, drains or watercourses with which the lateral drains could be connected, by having filled up private ditches made upon adjacent farms into which, if left open, the lateral ditches could have been made to drain the plaintiff's land.

4. ———: ———: ———: **Prescriptive Rights.** While prescriptive rights may be acquired in artificial watercourses, as well as natural ones, the owner of land can not acquire a prescriptive right to drain his land through ditches constructed by an adjacent owner upon the latter's land, when such ditches are of a temporary character and constructed to exist only as long as they served the purpose of the party constructing them.

Appeal from Cape Girardeau Court of Common Pleas.—
*Hon. Benj. F. Davis,* Judge.

REVERSED AND REMANDED.

*W. F. Evans and Moses Whybark* for appellants.

(1) The Northcut Cypress, before the construction of the ditch through it, never was a watercourse. It was a cypress marsh, densely covered with grass, cypress knees, brush and timber, and called by some of the witnesses a "jungle." Byrne v. Railroad, 47 Mo. App. 383; Jones v. Railroad, 18 Mo. App. 251; Benson v. Railroad. 78 Mo. 504; Railroad v. Schneider, 30 Mo. App. 620; 2 Farnham on Waters and Watercourses, p. 1562, sec. 459; 30 Am. and Eng. Enc. Law (2 Ed.), pp. 347-357; Brandenberg v. Ziegler (S. C.), 55 L. R. A.

414.  (2)  It was nothing more than a natural depres-
sion, and no one could use it for drainage purposes
but the owners of the land on which it was located,
and then for agricultural purposes only.  Plaintiff pos-
sessed this right to use this Northcut Cypress for that
purpose on his own land, but he derived his right from
the statute.  R. S. 1899, sec. 6962; Gray v. Schriber,
58 Mo. App. 173; 3 Farnham on Waters and Water-
courses, p. 2599, sec. 889-d.  He did not possess this
right at common law.  Walker v. Railroad, 165 U. S. 606.
(3)  The construction of ditches by defendants on the
sides of their roadbed could not have been made suit-
able to accomplish drainage, because they had no ditch
sufficient for that purpose to connect with, and the
court should have sustained the demurrer to the evidence
offered by the defendants at the close of the whole case.
Field v. Railroad, 21 Mo. App. 605; Graves v. Railroad,
69 Mo. App. 574; DeLapp v. Railroad, 69 Mo. App. 572;
Kenney v. Railroad, 69 Mo. App. 569.

*R. G. Ranney* for respondent.

(1)  Defendants were estopped from claiming there
were no ditches, drains, or watercourses because they
caused them to be filled up, because these ditches were
farm ditches, dug for agricultural purposes, and the de-
fendants had no right to close them up or obstruct them.
In fact they were expressly prohibited by statute from
doing so.  R. S. 1899, sec. 6969.  For the same reasons
the defendants had no right to build a solid dump or
embankment across Northcut Cypress or otherwise ob-
struct the same, for even if it should be held by the
court not to be a natural watercourse, yet it was a "nat-
ural depression," as defined by the statute, into which
the plaintiff had the right to and did construct drains.
R. S. 1899, sec. 6962; Gray v. Schriber, 58 Mo. App. 173;
Lile v. Gibson, 91 Mo. App. 488; Payne v. Railroad, 112
Mo. 21.  Appellants seem to contend that this case

must be governed by the common law rule as to sur-
face water, but this rule applies to railroads in this
State, only in the absence of statutory enactment, in
which case the statute must prevail. Gray v. Schriber,
58 Mo. App. 173; Cox v. Railroad, 174 Mo. 606; William-
son v. Railroad, 115 Mo. App. 75; Cooper v. Railroad,
123 Mo. App. 141. (2) Even after the construction
of the county or public drainage ditch in the Northcut
Cypress the defendants failed and refused to construct
lateral ditches to connect with it; and the cases of
Byrne v. Railroad, 47 Mo. App. 383; Field v. Railroad,
21 Mo. App. 600; Graves v. Railroad, 69 Mo. App. 574;
DeLapp v. Railroad, 69 Mo. App. 572; Kenney v. Rail-
road, 69 Mo. App. 569, cited by appellants or authori-
ties against them on this proposition.

STATEMENT.—This plaintiff suffered a loss of crops
in the years of 1903 and 1904, in consequence of the
overflow of his lands in the months of May and June.
The present action was instituted to recover the amount
of the loss on averments that defendants had omitted
to perform their statutory duty in regard to constructing
ditches by the sides of the railroad to drain away water
and prevent adjacent lands from being overflowed, and
this default was the cause of the damage. The petition
contains three counts, but a verdict was returned only
on the second and third, which are alike, except that
one relates to the year 1904, and the other to 1905. It
is stated defendants constructed a railroad through
plaintiff's land, describing it, in 1902; said land is in a
bottom and level, and prior to the completion of the
railroad and for a long time afterwards, there were
ditches, drains and watercourses running north and
south across the railroad and near plaintiff's land, into
which water falling or flowing on said land had al-
ways drained or flowed, and said ditches were sufficient
at all times to carry the water away from plaintiff's

land, and could have been connected by defendants with ditches and drains along the sides of their roadbed if such lateral drains had been constructed; it became the duty of defendants within three months after the completion of the railroad through the country, to cause suitable ditches and drains to be constructed along the sides of its roadbed to connect with other ditches, drains and watercourse already there as aforesaid, so as to afford sufficient outlet to drain and carry off the water along the railroad; defendants, not regarding their duty in that behalf, negligently and wrongfully closed up said ditches and drainage channels, except Drainage Ditch One, which had been constructed by the county of Scott; defendants constructed a solid embankment from one to five feet higher than plaintiff's land, extending from the town of Commerce to Sand Ridge, thereby completely damming up and obstructing the water from numerous springs on the south side of the railroad, as well as the drainage from thousands of acres of land which would, except for said embankment, have flowed south; and thereby causing water to overflow and stand on plaintiff's land at divers times during the year 1904, in such quantity that all his crops of corn, wheat, hay and other products growing on ninety-five acres were totally destroyed and the balance of his land rendered unfit for cultivation; the destruction of the crops and deprivation of the use of his land, were caused wholly by the failure and refusal of defendants to construct and maintain suitable ditches and drains along the sides of the railroad as required by the statute, whereby the waters were obstructed and forced to spread out over plaintiff's land, to his damage in the sum of three thousand dollars. The third count asked damages in the same sum for the loss suffered in 1905. A general denial was filed by defendants. Plaintiff's land lies four miles southwest of the town of Commerce, which is on the Mississippi river and the railroad extends from Commerce through his farm. The Mississippi river lies a mile or

so to the east, the intermediate country being bottom land, but not much subject to overflow from the river because of an elevation called Methodist Ridge, which extends south from Commerce parallel to the river and a quarter of a mile west of it. From that Ridge the land descends in a gentle slope westwardly to plaintiff's farm and to what is known as North Cut Cypress, a swampy depression running across the west side of the farm. This locality is from three hundred yards to three-quarters of a mile wide and is grown over with cypress trees, shrubs and bushes of various kinds; in fact is a jungly marsh. It extends a mile or two north from the railroad, indefinitely south of it and is the basin into which the surrounding country drains, particularly that to the east, the depression having no well-defined bank on the east side. Along its west side extends a bank ten or fifteen feet high known as Sand Hill or Sand Ridge, at the top of which begins a region denominated Sandy Wood, that extends westward. There was testimony to prove that on the extreme western side and at the foot of the bank of the North Cut Cypress marsh, a sluggish stream about a foot wide, meandered throughout most of the year, but went dry, except in little puddles, in the summer and autumn. Extending directly westward from the town of Commerce was a range of steep hills on the south slopes of which were springs whose waters flowed southward·toward the railroad. The railroad emerged from the hills at Commerce, and trended southwesterly for about a mile and a half to where it crossed plaintiff's farm and the North Cut Cypress. The slope of the country was southward from the hills to south of the railroad track, and the natural flow of water was in that direction. South of the railroad the flow turned to the southwest and proceeded in the same course until the North Cut Cypress swamp was reached, which was the natural outlet to carry the water to the Mississippi. Between the hills and the railroad are some four or five thousand acres of land,

through which flow a few rills from the springs to the north; notably one called Hawkins' Branch. The railroad is built on an embankment ranging from two feet to five feet high, the entire distance from Commerce to plaintiff's farm. It was higher of course toward plaintiff's land at the southwest, as the slope was in that direction from the river on the east and the hills on the north. In the year 1900 Scott county constructed a public drainage ditch twenty-two feet wide and five feet deep, known as "North Cut Ditch" and extending from somewhere south of the railroad northward to the head of North Cut Cypress Swamp. It was excavated in the swamp or depression and a little east of the center of it. After the construction of this ditch it became the outlet for the waters of the basin or watershed theretofore drained by the swamp. The railroad passed into the possession of these defendants in 1902, having been built in 1892 by another company. Years before the road was built, several landowners whose farms lay between Commerce on the east and plaintiff's farm on the southwest, had dug private ditches across their lands for drainage purposes and running, in the main, north and south. The company which built the railroad had left openings in the roadbed about fourteen feet wide across these ditches, so the waters flowing in them, and any water flowing from the north, would not be obstructed, but would flow to the south of the dump and then turn southwestwardly and flow into North Cut Cypress or North Cut Ditch as before. How these apertures in the road were constructed and whether with walls of masonry or not, the testimony does not show, but it proves they sufficed to let the waters of the country between the railroad and the hills escape to the south of the railway and thence to the southwest, instead of accumulating and overflowing lands north of the railroad. All these openings lay between plaintiff's farm on the west and Commerce on the east, and though not on his land, he suffered no inconvenience while they were

kept open. In the year 1902 these defendants filled them. There is testimony that thereafter water flowing southward from the springs in the hills, through Hawkins' Branch and other channels, and also rain-water, accumulated north of the railroad embankment, submerging a good part of plaintiff's farm and destroying his crops during the years 1904 and 1905. Plaintiff had dug three ditches on his own land, but it does not appear there were openings through the railroad dump for them. The testimony inclines to prove ditches could have been dug along the north side of the railway dump to connect with the North Cut Ditch on the west, and with the acqueducts through the railroad to the east of plaintiff's farm, if the latter had been left open, and that thereby a system of drainage could have been established which would have prevented the overflow of his land. A witness testified North Cut Ditch alone was not large enough to take care of the drainage of such a system, and a main ditch forty feet wide would have been required; but there was contrary evidence. The issues having been submitted to the jury, a verdict was returned in plaintiff's favor for $1,400, judgment was entered accordingly and defendants appealed to this court, where they complain mainly of the refusal of the court to direct a verdict for them, and of this instruction granted at plaintiff's request:

"The court instructs the jury that if you believe from the evidence that at the time of the completion of defendants' railroad, and within three months thereafter, there were ditches, drains or watercourses to afford a sufficient outlet to the water which might or would accumulate along the sides of the railroad, with which lateral ditches along the railroad, if constructed by the railroad company, could be connected, and that the railroad company or their grantor, instead of constructing or causing to be constructed and maintained suitable ditches and drains along each side of said railroad, caused said existing ditches, drains or water-

courses to be closed up, then and in that case the defendants are estopped from now claiming that there were no ditches,. drains or watercourses with which latteral ditches along the railroad could be connected."

GOODE, J. (after stating the facts).—1. This action is founded on the statute which makes it the duty of every railroad company or corporation, owning and operating a railroad in this State, or constructing one, to cause to be constructed and maintained in three months after the completion of the same through any county, suitable ditches and drains along each side of the roadbed to connect with ditches, drains or watercourses, so as to afford sufficient outlet to drain and carry off the water along the railroad, wherever the draining of such water has been obstructed or rendered necessary by the construction of the railroad. [R. S. 1899, sec. 1110.] Defendants say only surface water was obstructed and caused to overflow plaintiff's farm by the railroad embankment, and they were not bound to construct drains to carry off surface water, even granting there was a natural outlet with which lateral drains could have been connected. This position is untenable in fact or law. Part of the water intercepted by the railroad dump flowed into Hawkins' Branch from springs on the southern slope of the hills; and if a railroad bed obstructs the flow of surface water, the railway company must provide lateral drains to carry it off, if there is a watercourse, ditch or drain into which the lateral excavations may be made to flow. An adjacent proprietor damaged by the omission of this duty has an action against the company. [Williamson v. Railroad, 115 Mo. App. 72; Cooper v. Railroad, 123 Mo. App. 141; Cox v. Railroad, 174 Mo. 588, 606.] Most of the decisions wherein railroad companies were relieved from liability for obstructing the drainage of surface water, were pronounced without reference to

the statute involved in the present case.    [Clark v.
Railroad, 36 Mo. 202, 223; Abbott v. Railroad, 83 Mo.
271; Jones v. Railroad, 84 Mo. 151, 155; Moss v. Railroad, 85 Mo. 86; Johnson v. Railroad, 111 Mo. 378.]
Defendants invoke the cases of Field v. Railroad, 21
Mo. App. 600, and Kenny v. Railroad, 69 Mo. App.
569, the former of which does not support defendant's
position, and if the second does, its doctrine is contrary
to the doctrine declared by the Supreme Court in Cox
v. Railroad, supra.

Defendants say there was no proof any ditch, drain
or watercourse existed for defendants to connect lateral
drains with; but certainly there was testimony to prove
these could have been dug into North Cut Ditch, and
that by doing so the water which flowed against the
railroad dump would have been carried off much sooner
than it escaped by percolation and evaporation.    Plaintiff and other witnesses testified his farm was overflowed
sometimes for a week in consequence of the obstruction
of the drainage by the railroad dump, thus destroying
his crops and hindering tillage; whereas before the dump
was raised, water did not stand long enough to interfere
with cultivation.    We hold plaintiff made a prima-facie
case.

2.    The second instruction granted for plaintiff had
reference to the eight openings in the railroad dump
between plaintiff's farm and Commerce, closed by defendants in 1902, but left open by their predecessor for
ten years in order that the natural drainage of the land
north of the dump might not be hindered.    The instruction proceeded on the theory that if, prior to the
filling of these cuts or drainways, defendants might have
dug lateral ditches to them, thereby complying with the
statute, but instead of doing this, filled up the drainways, they were estopped to say there was no ditch,
drain or watercourse to connect with.    The instruction
was inaccurate; for granting the private ditches were
such as defendants should have drained to, closing them

would not work an estoppel in a technical sense; though no doubt in such an event it would be no defense to plaintiff's action that defendants had closed them. We prefer to consider the propriety of the instruction on broader grounds. The statute requires lateral ditches to be dug by railroad companies wherever there are "ditches, drains or watercourses" into which water gathered by the lateral ditches can be poured. Those designations do not signify necessarily, natural hollows, ravines or streams, but would include suitable artificial ditches or canals. Therefore the question is whether ditches dug across farms by the proprietors to drain their own lands, and cuts left in a railroad dump to prevent intercepting the flowage of such ditches, are drains, ditches and watercourses in the sense of the statute. The drains supposed in the present case to have afforded outlet for any lateral ditches defendants might have dug, are those which lay east of plaintiff's farm and on the lands of other proprietors who had excavated them for their private use. Plaintiff incidentally derived benefit from said ditches and cuts in the dump; for they prevented an accumulation of water on the north side of the railroad and thereby prevented long submersion of his land. We are cited to certain statutes claimed not only to inhibit defendants from closing the drains and openings, but to make the closing of them a misdemeanor. [R. S. 1899, secs. 6962, 6969, inclusive.] Very likely obstructing the ditches without the consent of the proprietors of the lands they drained, would have been actionable at the suit of those proprietors and an offence. Plaintiff's alleged right in the matter is more questionable; for the case stands on different principles from those applicable where a railway company has banked across a natural watercourse; which act would entail liability, if the company omitted to take care of the water and prevent it from damaging adjacent lands. [Munkres v. Railroad, 72 Mo. 514.] As the ditches were not on his land or intended to drain

it, and he had taken no part in making them, and had acquired no rights in them by direct grant from those who had made them, or as appurtenant to lands granted, we are of the opinion said statutes gave plaintiff no standing to object to their closure, either as against their makers or the defendants. For the same reasons and others to be stated, we think, too, plaintiff had no such right or easement to have his lands drained, by the private ditches and through the cuts in the embankment which, while open, had accommodated those ditches, as gave him an action on the statute against defendants for not digging lateral ditches to said artificial drainways. We do not say he had an easement or right in said artificial drainage system which would enable him to maintain any kind of an action for their closure, but we simply decide he has no case on the statute. For aught that appears, defendants may have closed the ditches pursuant to some arrangement with the persons whose lands they had been excavated to drain, and this might have been done to make a safe roadbed. [3 Farnham, Waters, sec. 908.]

The other reasons we have in mind why plaintiff cannot maintain an action on the statute for closing the drains, are these: as plaintiff was not a riparian owner we do not see how he could acquire an easement in the ditches by prescription. [24 Ency. Law (2 Ed.), p. 981, and citations in note 2.] And the further difficulty is presented that the private ditches appear to have been of a temporary character, in such sense as prevented an easement from being acquired in them by any one, against the persons who constructed them and those deriving title from said persons. Prescriptive rights may be acquired in artificial watercourses as well as in natural ones, where it appears the former are intended to be permanent instead of temporary, thus leaving room for a finding that their use by the party asserting prescription was not precarious and by way of license from the owner, but adverse. But when an ar-

tificial waterway is intended to exist only so long as suits the purposes of him who makes it through his lands, even a riparian proprietor can acquire no easement as against him. [3 Farnham, Waters, pp. 2428, 2434, particularly secs. 827b, 827d; Wood v. Waud, 3 Exchr. 748, 777.] In the case just cited, which is the leading one in England, where this question has been most considered, Baron Pollock said:

"We entirely concur with Lord DENMAN, C. J., that 'the proposition that a watercourse of whatever antiquity, and in whatever degree enjoyed by numerous persons, cannot be enjoyed so as to confer a right to the use of the water, if proved to have been originally artificial, is quite indefensible;' but, on the other hand, the general proposition that, *under all circumstances,* the right to watercourses arising from enjoyment, is the same whether they be natural or artificial, cannot possibly be sustained. The right to artificial watercourses, as against the party creating them, surely must depend upon the character of the watercourse, whether it be of a permanent or temporary nature, and upon the circumstances under which it is created. The enjoyment for twenty years of a stream diverted or penned up by permanent embankments, clearly stands upon a different footing from the enjoyment of a flow of water originating in the mode of occupation or alteration of a person's property, and presumably of a temporary character, and liable to variation."

In Arkwright v. Gell, 5 Mees. & Wel. 203, it appeared a drainway or "sough" built to drain certain mines, had been in existence for many years and a riparian owner claimed, both by grant and prescription, the right to operate his mill with the waters of the "sough." It was held the continuous use, even though it had lasted longer than the prescriptive period, would give him no easement if the "sough" was an artificial water course and made for a particular and temporary purpose; namely, for the convenient working of the mines.

In Gaved v. Martyn, 19 Com. Bench (N. S. 1865), 732, 756, a clear distinction is taken between artificial streams of a temporary and those of a permanent nature, in respect of the acquirement of easements in them by riparian owners; and so it was in Roberts v. Richards, 50 L. J. (N. S. 1881), 297; Burrows v. Lang, 2 Chancery, 1901, p. 502; Hanna v. Pollock, 2 Irish Rep. (1898) 532, 547. Those are English cases and the question seems to have been but little touched upon in the American decisions; but such relevant cases as we have found are even less favorable to the plaintiff's contention. [Lawton v. Railroad, 61 S. C. 548; Fox River, etc., Co. v. Kelly, 70 Wis. 287, 300; Chamberlain v. Hemmingway, 63 Conn. 1; Legree v. Railroad, 166 Ill. 249; Norton v. Colentine, 14 Vt. 246.] In this case the private drains and the cuts through the dump where they entered the right of way, had existed perhaps for the prescriptive period, and the question may occur whether this fact would give them a permanent character; that is to say, what is meant by temporary and permanent in the law of such cases? The question is answered in Burrows v. Lang, 2 Ch. (1901) 502, where it was said the meaning of "temporary" is not confined to a purpose which happens to last in fact for a few years only, but includes one, which in the reasonable contemplation of the parties may come to an end; meaning, we suppose, it will end upon the occurrence of an event, the occurrence of which is obviously probable. For illustration the court said, if a man pumps water from his mines for the purpose of draining them, this is a temporary purpose; or if he makes a water course for the use of his mill on his own land, that is a temporary purpose, for it is limited to the period during which he uses the mill. In the present case the private drains might be closed by the owners, or with their consent, at any time.

We are conscious of the fact this record touches questions regarding water and drainage rights which have not been settled fully by the courts of this country

and are of increasing importance, and hence we wish to decide no more than is called for by the appeal. In view of the authorities, supra, we must hold that as regards plaintiff, who is not a riparian owner, the private artificial drains in question, were not such outlets as defendants were bound to dig lateral ditches to, on pain of laying themselves liable to an action for damages by plaintiff for the submersion of his land.

We are not passing on the question of whether plaintiff could have an action against defendants for causing the water to accumulate against their embankment and overflow his farm, but confine our decision simply to their liability to him for failure to dig ditches to the private drainways. It is worthy of note in this connection that the evidence tends to prove the inundation of his farm was due, not to the want of lateral ditches leading to the private drains, but to closing the latter. Indeed plaintiff's testimony proved reopening but three of them afforded relief.

The instruction under review is erroneous and for that reason thé judgment must be reversed and the cause remanded. All concur.