Francis R. ARMSTRONG and Mildred Armstrong, His Wife, Plaintiffs-Appellants,

v.

WESTROADS DEVELOPMENT COMPANY, a Corporation, et al., Defendants,

Stix, Baer & Fuller Company, a Corporation, and City of Richmond Heights, Missouri, a Municipal Corporation, Defendants-Respondents.

No. 31103.

St. Louis Court of Appeals.

Missouri.

June 15, 1964.

Rehearing Denied July 20, 1964.

530

Kerth, Thies & Schreiber, C. Kenneth Thies, Dalton W. Schreiber, Clayton, for plaintiffs-appellants.

Bryan, Cave, McPheeters & McRoberts, St. Louis, Thomas V. Connelly, for defendant-respondent Stix, Baer & Fuller.

Louis A. Robertson, St. Louis, for defendant-respondent City of Richmond Heights.

BRADY, Commissioner.

This case was very recently reassigned to the writer. The action was originally brought against the respondents, hereinafter referred to as "Stix" and "Richmond Heights," and three other corporations who are subsidiaries of the defendant Stix. These are Westroads Realty Company, Westroads Development Company, and Clayton Road Development Company, hereinafter referred to as "Clayton Road." The trial court sustained motions to dismiss as to both of the Westroads corporations. The jury returned a verdict in favor of the defendant Clayton Road and against the defendants Stix and Richmond Heights in the amount of $2,000.00. Upon timely motion the trial court set aside the verdict as to Stix and Richmond Heights and entered judgment in their favor. From that judgment the plaintiffs appeal. They do not challenge the jury's verdict in favor of Clayton Road, and neither do they appeal from the trial court's action dismissing this cause as to Westroads Realty and Westroads Development Companies.

The plaintiffs' petition alleged their ownership of Lot #18 in Berkshire, a residential subdivision in St. Louis County, and that " * * * said creek is a source of drainage of said property * * *." It further alleged that in connection with the development of Westroads Shopping Center the defendants " * * * enclosed said 'Black Creek' in a long, concrete tube along the western end of said shopping center and within the city limits of the Defendant City of Richmond Heights, Missouri, and by said act Defendants have deprived Plaintiffs of the natural source of drainage of surface waters from their said property." The petition further alleged "[t]hat as a proximate result of said wrongful act on the part of Defendants in enclosing said

creek, * * *" plaintiffs had suffered certain monetary damages as a result of their property being made wet, boggy, and unusable and due to the loss of "a great number" of shade trees.

In order to assist in understanding the relative positions of the lands involved, we have caused one of the exhibits to be reproduced in this opinion. In addition we have placed two arrows on this reproduction,

-2-

marked "A" and "B", to indicate the direction in which the parties contended surface water flowed from plaintiffs' lot prior to defendants' work. The plaintiffs' property is approximately two acres in area with the front thereof being about thirty feet higher than the rear. Other lots in the subdivision and the Immacolata Church and School property are also higher than the rear of plaintiffs' lot so that plaintiffs' testimony was that water from some ten acres of land drained down across the rear of their lot. There were catch basins located at different points which helped collect this water. Two of these are located on either side of Ashmere Drive in front of Lot #16. The water from these catch basins flowed through 15 inch pipes that were buried on the property line between the lots. These pipes opened up at the rear of the lots. This water and surface water generally then ran down a ravine which ran along the property line separating the lots from the Immacolata property and also separating plaintiffs' lot from the park area. Three other catch basins were located as shown on the drawing included in this opinion and which emptied water through a 15 inch drain running parallel to Eastfield Drive and opening at the rear of Lot #48. Eastfield Drive is a paper street only. It does not exist as a street. At the time plaintiffs constructed their house on Lot #18 there was a water problem existing in the rear of their lot. To alleviate this condition the plaintiffs placed an earthen embankment, a kind of a dam, along their land as it bordered the ravine to prevent this water from flowing on their land. They also constructed a dam along Eastfield Drive to keep the water collected by the second group of catch basins from coming onto their land. These measures succeeded in keeping the plaintiffs' land dry until defendants began their construction.

There is a serious dispute as to the direction in which the surface water which reached the rear of plaintiffs' lot found its way into the old channel of Black Creek.

The defendants' evidence was to the effect that this water left the rear corner of plaintiffs' lot, trickled across what would have been Eastfield Drive, continued on its way across the very rear portion of Lot #48 and then meandered across the property of Clayton Road eventually emptying into Black Creek near Hoover Avenue in the manner shown by Arrow "A". As stated, this was the defendants' evidence. It was denied by the plaintiffs, and we are cognizant that for the purposes of this appeal we are to view the evidence in the light most favorable to the plaintiffs. However, we have grave difficulty in determining just what plaintiffs' evidence was. In plaintiffs' brief the following appears: " * * * The Plaintiffs' evidence is that said water flowed Northeast from their lot across the Park Area, finding its way into Black Creek at the first bend in the channel thereof after Black Creek crossed Clayton Road (R. 131, 132, 173, 174, 175, 179, 180, 181, 182, 183, 186, 209, 210, 211, 212, 215, 216, 247, 252, 253, 255)." There is absolutely nothing with regard to this issue that appears in the record at pages 255, 252, 247, 216, 215, 212, 211, 210, 179, 174, 173, 132, or on page 131. Presumably, those pages were cited to add numerical emphasis to the plaintiffs' statement. All that appears on page 175 is that the ravine catches the water from the other properties and "[c]arries it on past lot 18 into Black Creek." It does not state where in Black Creek the water enters. The only thing on this issue that appears on page 209 is that plaintiff's answer that the surface water " * * * trickled over into rivulets into Black Creek when I first started out there." This again is of no assistance to help us determine where the water went into Black Creek before the defendants' work began. On page 183 of the record the plaintiff denied that the water left the rear of his property and entered Black Creek near Hoover Avenue as defendants contended. On pages 185 and 186 of the transcript the following appears: "Q Where did the drainage come from your property? Can you again point out

the direction the drainage from your property—A My remembrance is it came across here down through here into the old Black Creek (ind.). Q Would that be west of Stix's property or would it be down here on Stix's property (ind.)? A No, it would be west of Stix's property. Q And the water drained off your property west of Stix's into Black Creek Channel? A Into Black Creek Channel. Q Right at the point— A I don't know what point—the water came down here and on over—does this show any tributaries where all the water came off of Immacolata and that park—any tributaries going into the creek —there's water flowing off— Q Mr. Armstrong, isn't it a fact that between the back of your property and Black Creek Channel there was a ridge and the water didn't flow to the north but flowed to the southeast into this channel? A I don't think so." In the record at pages 179 through 182 this issue was dealt with on cross-examination. The plaintiff was asked to point out on one of the exhibits where the waters crossed his lot and " * * * how they left your lot prior to the time this culvert was installed?" His answer was as follows: "A Well, I can show you approximately but I can't show you definitely because nobody could find a corner of the lot back there at that time." Following this he was again asked: "Q Do you know where the water drained off your property into the old channel? A No; in my estimation they came right across here and came into this Black Creek Channel. Q You are pointing, I believe, Mr. Armstrong, across the park area from Stix's property and Immacolata Church and to the first bend in the channel after it crossed Clayton Road? A I don't know whether it's the first channel because when you stand in this yard you are completely messed up on directions—it's not easy because the lot is on a curve. You don't know which direction you are pointing. I say the water came off this lower corner and went on into the Black Creek in there (ind.) somewhere. Q You are pointing

that the water left your property in a general northeastwardly direction? A No, southeastwardly direction. Q This is north up here (ind.). A That's a southeastwardly direction. Q. And this would be south down here (ind.)?" In the record at page 182 he reiterated that this surface water drained to the southeast and into Black Creek. The southeast is the general direction in which defendant contends that the water drained, eventually emptying into Black Creek at Hoover Avenue. Parenthetically, we might again state that it is of no assistance to an appellate court reading the record and trying to determine to what area a witness was testifying to have questions phrased and answers made in such general language as "north up here (ind.)" or "south down here (ind.)" or "right about here" and other similarly phrased questions and answers.

The point of this dispute as to the direction of the flow of surface water from plaintiffs' property prior to the acts of the defendants is that if the water flowed as defendants contend, then obviously the plaintiffs failed to make a case. This for the reason that since the surface water entered Black Creek after the new culvert ended, it was not the defendants' actions in enclosing Black Creek that prevented drainage of surface water from plaintiffs' lot, but was the grading up of defendant Stix's property to the property line that prevented the flow of surface water. There would therefore be no causal connection between the defendants' acts as submitted in the instruction and plaintiffs' damage. See the cases collected in "Surface Water in Missouri," an excellent article appearing in 24 Mo.Law Rev. 138. While the record on this issue leaves much to be desired, we believe that reading the whole transcript in the light required of us requires that we construe the plaintiffs' evidence to be that the surface water ran off of their lot in the direction of the arrow marked "B" on the reproduction included in this opinion and entered the old channel

of Black Creek at the first bend after Black Creek crossed Clayton Road.

When the defendant Stix began developing Westroads Shopping Center, it recognized that the grading up of the property now used as a parking lot would create a surface water problem at the rear of plaintiffs' lot. In connection with the regrading and the paving of this parking lot a portion of Black Creek was to be enclosed in a large concrete culvert as shown on the exhibit reproduced in this opinion. To provide for this culvert Clayton Road, Dr. Magee, the owner of Lot #48, and the park area trustees granted to the city of Richmond Heights an easement strip 50 feet wide. It was along this easement that the large culvert was laid, and it appears in the exhibit reproduced in this opinion as the "new channel." After this culvert was laid, the grade was raised by the addition of dirt and regrading so that the top of this culvert was below ground. To alleviate the surface water problem, the existence of which had been anticipated, an 18 inch drain line was laid from the rear of plaintiffs' lot across Eastfield Drive to the rear of Lot #48 and culminating in an underground opening in the side of the culvert carrying the new channel for Black Creek. A stop gate was erected where the 18 inch culvert entered the new channel culvert so that when the new channel was full, water would not flow back into the 18 inch pipe and thus back on Lots #18 and #48.

Richmond Heights did not adopt any ordinance providing for the relocation for the channel of Black Creek nor for any ordinance providing for the construction of the culvert containing the new channel. It did install the 18 inch drains running from the rear of Lot #18 and Lot #48 to the new culvert.

The evidence was that after this work was done, the rear of plaintiffs' lot became very marshy and unusable and that winds easily uprooted trees located in that area.

As previously indicated herein, the jury did find for the plaintiffs and assessed their damages at $2,000.00. This verdict was returned against the defendants Stix and Richmond Heights. The jury returned a verdict in favor of the defendant Clayton Road. The City of Richmond Heights filed a separate motion to set aside this verdict and to enter judgment in accordance with its motion for its judgment or in the alternative for a new trial. The defendant Stix filed its timely motion to set aside the judgment and to enter judgment in its favor. It is to be noted that the defendant Stix did not couple that motion with a motion for a new trial. The trial court sustained the motions of both defendants to set aside the verdicts in accordance with their motions for a directed verdict and entered its judgment in their favor. The trial court's order is as follows: "* * * Motion of Defendant City of Richmond Heights to set aside verdict and enter judgment in accordance with its motion for directed verdict sustained for the reasons stated in Sections 1 and 2 and paragraphs thereof; Motion of Defendant Stix, Baer & Fuller Company to set aside Judgment in favor of Plaintiff and enter Verdict and Judgment in favor of Defendant Stix, Baer & Fuller Company sustained for the reasons stated in paragraphs 1 and 2." Since the motion for directed verdict offered at the close of all the evidence by the defendant Stix and by the defendant Richmond Heights does not contain any paragraphs but is merely based on the contention that the plaintiffs failed to make a submissible case, the paragraphs referred to in the trial court's order must be paragraphs 1 and 2 of their after-trial motions. There are two paragraphs to defendant Stix's after-trial motion, and these amount to a contention that the plaintiffs have failed to make a submissible case. The defendant Richmond Heights' after-trial motion to set aside the verdict and to enter judgment in its favor does not contain two paragraphs but does contain paragraph 1 with subparagraphs A through H. Essentially, these

amount to a contention that the plaintiffs failed to make a submissible case. The second paragraph of the motion filed by the defendant Richmond Heights deals entirely with its motion for new trial, a motion that was not granted by the trial court. Accordingly, we must assume that the trial court intended to rest its ruling as to both defendants upon the basis that the plaintiffs had failed to make a submissible case as to either.

In the determination of that issue we must have reference to the submission made by the plaintiffs. The plaintiffs' verdict-directing instruction begins with the following statement: "The court instructs the jury that it is the law that one may not obstruct a natural water course without liability for resulting damages to others who may be adversely affected thereby." This abstract statement of law is then followed by hypothesizations which require the jury to find that Black Creek was a natural watercourse and "the source of drainage of surface waters from the property of the plaintiffs"; that the defendants "enclosed said Black Creek in a long underground concrete tube"; that the enclosure of Black Creek in this tube "* * * deprived, blocked or impeded plaintiffs of the natural source of drainage waters from their said property"; and that as a result thereof the plaintiffs' property had became marshy, boggy and wet and that plaintiffs had been damaged by reason thereof." Upon these findings the jury was instructed to find for the plaintiffs.

■ The transcript is clear that the acts of which plaintiffs complain were in fact the acts of the defendant Clayton Road. That corporation owned the property on which the parking lot was constructed, it contracted for the construction of the culvert, and it ordered the regrading. None of these actions were the actions of the defendant Stix. The record is equally clear that the defendant Stix was the parent company of the defendant Clayton Road. As stated earlier herein, the jury

found in favor of Clayton Road. The defendant Stix contends that if the acts of Clayton Road had been found to have rendered it liable to the plaintiffs, then Stix might also be liable either on a theory of participation with Clayton Road as a principal or on the theory that Clayton Road was Stix's agent when it committed the acts. But, Stix argues, since the jury found Clayton Road, the party committing the acts which allegedly caused plaintiffs' damage, not liable to the plaintiffs, then Stix cannot be liable either as a party participating in the acts and aiding and abetting their commission, or as a party which caused the acts to be committed by an agent. See 89 C.J.S. Trial § 500. However, we will not rule that point for the reason that it was not raised by the defendant Stix in its motion to set aside the verdict. It should also be noted that such a contention if sustained would cause us to remand the case for new trial thus granting Stix, who did not file a motion for new trial, relief which it has not requested.

It is important that what is not involved here be clearly stated. There is no contention that Black Creek is not a natural watercourse. Neither is there any contention that the culvert caused Black Creek to back up and overflow plaintiffs' lands, nor that the culvert was inadequate to handle the flow of Black Creek, nor that there was any obstruction created in the flow of Black Creek. It is clear that the obstruction was to the flow of surface water seeking to enter Black Creek. There is no issue of negligence raised as to the manner in which the new channel was constructed. As is obvious from the petition and from their verdict-directing instruction, the plaintiffs do not contend the defendants were negligent in the construction of the 18 inch drain running from the rear of plaintiffs' property and entering into the culvert enclosing Black Creek in its new channel. It should also be noted that the plaintiffs do not base their claim upon an easement nor upon the establishment of any prescriptive right. The plaintiffs did not file a petition

containing separate counts as to each defendant. All were included in the same count. When they submitted their case, the plaintiffs followed the same course. They submitted that the "defendants" (that is, those still in the case, i. e., Stix, Clayton Road and Richmond Heights) enclosed Black Creek in this "concrete tube" and changed its channel. The verdict-directing instruction does not state any other action of any separate defendant. The land herein involved is not agricultural land but is land lying within a densely populated urban area. It is equally important that the terminology used be clearly stated. While there is some dispute in the evidence as to what direction they ran, it is undisputed that the surface waters from the back of plaintiffs' lot ran in "rivulets" from the back of plaintiffs' land into Black Creek prior to defendants' construction. It often happens that courts use the expression "watercourse" to describe these rivulets. The plaintiffs do likewise. In his work on Waters at Section 889(d), Farnum points out that this confusion of natural drainage channels with watercourses has needlessly complicated the question of rights of upper and lower owners with respect to surface drainage. The result has been that the term "watercourse" has come to have two distinct meanings: one referring to a watercourse in and to which riparian rights may attach and the other referring to a watercourse through which an upper owner may discharge water from his land. See Thompson v. Andrews, 39 S.Dak. 477, 165 N.W. 9. A great variety of terms such as "drainway," "waterway," and other similar expressions have been used to describe the flow of surface waters in defined courses. In the instant case we are concerned with the drainage of surface waters into a watercourse, and to avoid the confusion arising from the duplication and meanings given to the term "watercourse" we shall refer to the direction and manner of drainage of the surface waters as a "drainway" and use the term "watercourse" only to refer to Black Creek.

■ It is the defendants' position that; as stated in their brief, "* * * While plaintiff asserts that his damages arise by reason of interference by defendants with a natural watercourse that is actually and clearly not the fact. The enclosing of Black Creek in the large culvert was but incident to the regrading of the adjoining properties. It was the grading up of these adjoining properties between plaintiff's land and the Creek which deprived plaintiff of its source of drainage. * * *" We cannot agree. Accepting as we must the plaintiffs' evidence that surface water drained from their lot in the direction of arrow "B" as shown on the reproduction included in this opinion, it is clear that this water would have reached Black Creek regardless of how high the defendant Stix raised the grade of the parking lot had it not been for the "concrete tube." This for the reason that the defendant Stix could not grade up beyond its property line, and to grade to that point would not prevent the surface water from entering the old Black Creek Channel as shown by arrow "B." However, this does not mean that we should rule this case for the plaintiffs. Their position is based entirely upon their contention that they have an absolute right to have Black Creek continue in its old course and without enclosure within a "concrete tube" so that the surface water from their lot may drain therein in the manner and at the point stated in their evidence.

The cases cited by the plaintiffs do not support such a contention. In Gibson v. Sharp, Mo.App., 277 S.W.2d 672, there was a bayou which ran through the defendants' lands and came within some 75 yards of the plaintiff's land. This 75 yards belonged to the defendants. The plaintiff submitted her case on the theory that she had acquired a right to drain her land through a ditch dug across this 75-yard strip of defendants' land into the bayou, and the defendant could not block the ditch. Plaintiff proceeded upon two theories: equitable estoppel and the acquisition of a prescriptive right. Even

assuming the bayou be constituted a watercourse, a matter not specifically decided in that case, the distinctions between that situation and the one at bar are obvious. Gibson in no way involved what plaintiffs insist is the real issue in this case, i. e., change in a natural watercourse. Possibly plaintiffs' confusion arises from the application of the word "watercourse" to the ditch or drainway which was blocked. Moreover, the plaintiffs in the case at bar have not proceeded upon either of the theories upon which the plaintiff in Gibson based her case and upon which that case was ruled. In Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698, the discussion at l. c. 703–704 indicates clearly that what was there involved was a situation where a natural watercourse was dammed so that waters were caused to back up and flood plaintiff's lands. There is nothing of that situation here involved, for the waters causing the damage in the instant case never reached the watercourse. Moreover, Happy v. Kenton, supra, and Jacobs v. Frangos, Mo.App., 329 S.W.2d 262, involves parties who were riparian owners. Zook v. Louisiana, Mo. App., 12 S.W.2d 518, involves the collection of surface water and the discharge of that water upon plaintiff's lands. Hardy v. Kansas City, Mo.App., 284 S.W.2d 27, involves a charge of negligence in the interference with an existing drainway and also in the construction of its replacement. Lucas v. City of Louisiana, Mo.App., 173 S.W. 2d 629, was brought and tried upon a theory of negligence. These cases are inapplicable to the case at bar as no allegation of negligence is here involved. Haferkamp v. City of Rock Hill, Mo., 316 S.W.2d 620 at l. c. 624–627(4), contains an exhaustive citation of authorities upon matters closely related to the issue here involved but none that are directly in point. In Haferkamp the issue was whether a landowner had the right to collect surface water and discharge it into a natural drainway upon his own land.

 We have not been cited to any case where this point has been ruled nor

was any found. However, the geographic positions of the lands here involved are determinative of the issues. The plaintiffs are nonriparian landowners. It is well settled that a riparian owner is entitled to have a stream or watercourse continue to flow through or on his lands in its natural course without any obstruction of the channel or digression of the waters by other owners which is injurious to him. Happy v. Kenton, supra; South Side Realty Co. v. St. Louis & S.F.R. Co., 154 Mo.App. 364, 134 S.W. 1034; 93 C.J.S. Waters §§ 9, 15; Mueller v. Klinhart, Mo.App., 167 S.W.2d 670; Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978. To the same effect see 56 Am.Jur., Waters, Sec. 274. The plaintiffs cite Happy v. Kenton, supra; Jacobs v. Frangos, supra; and Gibson v. Sharp, supra, as well as other cases which contain the statement that one may not obstruct a natural watercourse without liability for ensuing damages to others. What plaintiffs do not take into account is that the term "others" as used in such statements does not refer to the public generally, but in fact refers only to other riparian owners. A riparian owner is an owner of land bounded by a watercourse or through which a stream flows, and generally only such an owner may claim or exercise riparian rights which are those rights pertinent only to lands which actually touch on the watercourse or through which the watercourse flows. 93 C.J.S. supra § 8; Restatement, Torts, Vol. IV, Sec. 843. It is equally well settled that riparian rights are not available to those who do not own or control riparian land, and riparian land must be in actual contact with the waters, proximity without contact being insufficient. 56 Am.Jur., supra, Sec. 283. In the instant case the plaintiffs' land is not riparian. It did not touch the old channel of Black Creek at any point, and it does not touch the new channel.

 In a note appearing in 28 A.L.R. at 1262 entitled, "Right to drain surface water into natural watercourse," it is stated that, as a general rule, " * * * the owner

of a dominant estate has a legal right, in the exercise of a reasonable use of his premises, to drain surface water into a natural watercourse *traversing or bordering the same*, and into which such waters naturally shed or drain, although the flow of the water is thereby accelerated and the volume increased." (Emphasis supplied.) We are not here concerned with a claim of accelerated flow or an increase in volume beyond the capacity of the culvert enclosing the new channel of Black Creek, but the statement, and the cases cited in support thereof, are clear indications that the right to drain into a watercourse depends upon the watercourse traversing or bordering the lands drained. Gray v. Schriber, 58 Mo. App. 173, cited in the note is a case involving agricultural lands which are governed by a special statute in this state. Rychlicke v. St. Louis, 98 Mo. 497, 11 S.W. 1001, 4 L.R.A. 594, also cited in the note is a case involving the discharge of accumulated surface water. In Greisinger v. Klinhardt, supra, at l. c. 980, the court held: " * * * The right to the flow of a natural non-navigable stream, in its natural way, applies to upper and lower owners of land across which the stream flows. * * * " Accordingly, the actions of the defendants with respect to Black Creek do not give rise to the cause of action stated by the plaintiffs in their petition and submitted in their verdict-directing instruction.

▌ The application of such rules to the instant case is made even more apparent by the fact that land belonging to the trustees of the subdivision, the park area land, is interposed between plaintiffs' land and Black Creek. Missouri follows a modified version of the "common enemy doctrine." There is no doubt that the trustees of the "park area" could erect a wall or take whatever other reasonable measures they wished to ward off surface waters flowing onto

their land from the plaintiffs' land. Haferkamp v. City of Rock Hill, supra, and cases cited at p. 625. In addition are Goll v. Chicago & A. R. Co., 271 Mo. 655, l. c. 665, 197 S.W. 244; Mehornay v. Foster, 132 Mo.App. 229, 111 S.W. 882, at l. c. 231 of the appeal report; Johnson v. Leazenby, 202 Mo.App. 232, 216 S.W. 49, l. c. 50. See also the discussion of this question and the authorities cited in Casanover v. Villanova Realty Co., Mo.App., 209 S.W.2d 556 at l. c. 558. As has been stated, in the instant case there is a total absence of any contention that plaintiffs had any easement, prescriptive right or other permission to drain their land by rivulets running across the "park area." Yet a decision that plaintiffs had the right for which they contend would burden the park area with a drainway, even though the owners of that land are not parties nor in any manner involved in this action.

The plaintiffs failed to state a cause of action upon which relief could be granted, and the trial court should have sustained defendants' motions for directed verdicts. The trial court did not commit error when it set aside the verdict and judgment for plaintiffs and entered judgment for the defendants. That judgment should be affirmed. The Commissioner so recommends.

PER CURIAM:

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The judgment is affirmed.

ANDERSON, P. J., and SAM C. BLAIR and PHIL H. COOK, Special Judges, concur.

RUDDY and WOLFE, JJ., not participating.