ANDREW GREISINGER v. FRED KLINHARDT ET AL., Appellants.—9 S. W. (2d) 978.

Division Two, October 6, 1928.

*Orrin L. Munger* and *Foristel, Mudd, Blair & Habenicht* for appellants.

*Davis & Dameron, Edgar & Banta, Emil E. Brill, Charles G. Revelle, James A. Rector* and *Elliott W. Major* for respondent.

190

WHITE, J.—The plaintiff, June 19, 1924, brought this suit to enjoin defendants from draining the waters from Lake Killarney, an artificial lake in Iron County. Defendants owned the land at the lower end of the lake where the dam was built, and the plaintiff owned the land at the upper end of the lake. The trial court issued a temporary injunction, and defendant filed a motion to dissolve. The court took evidence and overruled the motion, from which ruling defendants appealed.

All the land covered by Lake Killarney, and all the land owned by both plaintiff and defendants, under and adjacent to the lake, was formerly the property of the Arcadia Country Club. Through this land flowed Stout's Creek. In 1910, the Arcadia Country Club constructed across the creek a concrete dam four hundred and twenty-six feet long and thirty feet high. This caused the formation of Lake Killarney, which covered about 175 acres, and was three-fourths of a mile in length. Soon after acquisition of the property the Arcadia Country Club mortgaged it. This mortgage subsequently was foreclosed and through mesne conveyance and by tax deeds plaintiff and defendants acquired the land which they now own.

The plaintiff claims that the line between the two properties was about half way up the lake. The defendants claim that eighty-five per cent of the water of the lake was on their land. The plaintiff asserted and the defendants denied that the plaintiff also owned the land upon which about thirty-six feet of the dam at one end rested. The evidence upon this point turned upon the location of a survey

and conflicting surveys. The trial court found the issue for the plaintiff. We think the weight of the evidence supported that finding.

The defendants had built cottages for rent upon their land at the lower end of the lake, constructed a diving tower for bathing purposes, rented boats, and served meals. The plaintiff likewise had erected a number of cottages at the upper end of the lake, and also maintained boats and the like for rent. Thus the plaintiff and the defendants each conducted a recreational resort, and each depended upon the waters of the lake for that purpose. Each obtained title and began improvements in 1922, about two years before this suit was brought.

Evidence showed that the lake had been stocked with fish from both federal and state hatcheries. It was shown without objection that immediately after the dam was constructed in 1910, the lake was thrown open to the public and people began to fish there. The place had been more or less public since that time. Two or three years after the dam was built it gave way in part and was repaired by means of subscriptions from people in the neighboring towns. Lots around or near the lake were sold by the Arcadia Country Club to its members, conditioned that the grantees should not convey to any persons other than members of the club.

The plaintiff and defendants got along very well for a time, each conducted a resort, and the guests of each used the entire lake. Then trouble began. Defendants objected to the patrons of the plaintiff coming down to the lower end of the lake, and ordered them off. The plaintiff offered evidence to show that the defendants enforced their persuasion by threats. The defendants stretched a wire fence across the lake on what they claimed was the line between their property and that of plaintiff. They then opened some pipes through the dam for the purpose of lowering the water of the lake. If it had been drained down to the level of those pipes there would have been very little water left on the plaintiff's end of the lake. Plaintiff's witnesses testified that at the line where defendants built their fence the water was about fifteen feet deep. One of the defendants testified that it was about seven or eight feet deep. The plaintiff's resort was about a mile nearer to town than the defendants' resort, and apparently that superior advantage made the defendants uncomfortable.

The defendants claimed they were lowering the waters of the lake for the purpose of repairing the dam. This was disputed by the plaintiff, who offered evidence to show that any repairs necessary should have been made without lowering the water. Numerous witnesses swore to statements made by one defendant Klinhardt that he

intended to drain the lake and leave Greisinger high and dry or in the mud. Other facts indicate unpleasant feeling between the parties.

In overruling the motion to dissolve, the court necessarily found that the defendants did not in good faith lower the lake to make repairs, but for the purpose of injuring plaintiff. The law claimed to be applicable to the case is considered and argued under various aspects. We will consider one principle which we think decisive of the case.

I. The defendants while claiming as a fact that they were lowering the lake for the purpose of repairs, assert the right to empty the lake and remove the dam.

In Hall v. Morton, 125 Mo. App. 1. c. 323, the following statement of the law of implied easement applicable is quoted:

"Where the owner of land has, by any artificial arrangement, effected an advantage for one portion, to the burdening of the other, upon a severance of the ownership the holders of the two portions take them respectively charged with the servitude and entitled to the benefit openly and visibly attached at the time of the conveyance of the portion first granted."

See, also, Eliason v. Grove, 85 Md. 215; Smith v. Lockwood, 100 Minn. 221; Kahn v. Cherry, 131 Ark. 49; Jarvis v. Seele Milling Co., 173 Ill. 192; 19 C. J. 914.

That principle applies to ways, lateral support, and riparian rights. The appellant cites Bussmeyer v. Jablonsky, 241 Mo. 681, where this court had under consideration the principle as applied to an alley between two properties formerly owned by a common grantor. It was held that the alley was not reasonably necessary for the enjoyment of the dominant estate. Many authorities from several states were cited and considered and the conclusion stated that an easement in such case arose by implication if it were such "as renders the easement necessary to the convenient and comfortable enjoyment of the property as it existed when the severance was made." [l. c. 694.]

The court added (l. c. 696) : "The cases, as well as the text-books, seem to emphasize the element of necessity in cases involving road or passage ways, more than in cases involving easements of a different character."

The easement claimed here is one of different character and the element of necessity should not be so strictly applied. It will be noted in the quotation from the Hall case, supra, that the easement charged upon the servient estate must be "openly and visibly attached at the time of the conveyance of the portion first granted."

It is not a question of prescription, but a question of the apparent attachment for the enjoyment of the property granted. It must be reasonably necessary for the enjoyment of the dominant estate. It must be apparent at the time of the severance by the original owner. The question is whether that principle can be applied to the facts in this case.

II. Considerable argument is offered by the defendants to show that Stout's Creek was not a navigable stream, with the apparent inference that therefore no riparian rights inure to owners of the land adjacent the artificial lake made by damming that stream. Riparian rights are not confined to navigable waters. [1 Farnham, 278; 2 Farnham, p. 1565.] The right to the flow of a natural non-navigable stream, in its natural way, applies to upper and lower owners of land across which the stream flows. That may apply with equal force to a stream diverted to an artificial channel. Where the owner of a farm dug a ditch diverting a spring from its natural course so as to cause it to flow over another part of his farm and make a pond, and devised the different portions in severalty, he created dominant and servient tenements as to this water flow, as fully as it existed at his death, and the devisee acquiring the spring had a right to keep open the ditch so as to maintain the *status quo*. [Schuler v. Weise, 9 Mo. App. 585.]

The principle applies to the maintenance of a mill dam to its original height in backing up water upon the servient estate. [Baker v. McGuire, 53 Ga. 245; Ice Co. v. LaPlant, 136 Iowa, 621, l. c. 631; 2 Farnham on Water Rights, 1495; Mendota Club v. Anderson, 101 Wis. 479, l. c. 492-3; Jarvis v. Seele Milling Co., 173 Ill. 192; Burwell v. Hobson, 65 Am. Dec. 247; Eidemiller Ice Co. v. Guthrie, 42 Neb. 238.]

In 3 Farnham, page 2407, the principle is thus stated: "Rights may be acquired in an artificial condition of water in the same way that they can be acquired in real estate generally. This may be by grant, contract, express or implied, or by prescription." [See also Ibid, p. 2409.]

In Brill v. Railroad, 161 Mo. App. 472, Judge ELLISON of the Kansas City Court of Appeals said (l. c. 475), quoting from Farnham: "If the artificial channel is substituted for a natural one, or is created under such circumstances as indicate that it is to be permanent and to be a watercourse the same as though it was created by nature, riparian rights may attach to it."

In Ranney v. Railroad, 137 Mo. App. 537, l. c. 548-9, the St. Louis Court of Appeals, opinion by Judge GOODE, held that prescriptive rights might be acquired in an artificial watercourse, as well as in a

natural one, provided the artificial watercourse was intended to be permanent.

If an easement could be acquired in an artificial watercourse by prescription, it could for like reason be implied in a grant.

In Toothe v. Bryce, 50 N. J. Eq. 589, a premises was conveyed where water was furnished by underground pipes from another part of the owner's premises upon which was a spring. The court said (l. c. 608) : "It seems to me that the proper inquiry in such cases is whether the apparent and continuous easement in question forms a part of the tenement, and is beneficial to and adds to its value for use, and will continue to do so in the future. If it is, then the grantee is, upon plain principles, entitled to have it continued."

In Elliott v. Sallee, 14 Oh. St. 10, the owner of three mills and mill dams upon a stream, conveyed the mills each to one of his three sons. The lower mill was supplied by a mill race across a peninsula from the upper dam. The owner of the middle mill afterwards conveyed it to the plaintiff, who sued the owners of the lower mill for diverting the water from that mill race. The court held that the operator of each mill had a right to have the situation continued as it was when the original owner parted from the property. The court said (l. c. 17) : "On every principle of reason and common sense, he [the owner] must have intended to grant to his sons respectively, and they must have expected to receive, each his mill with its appurtenances as it actually existed in fact and in use at the time of the conveyances, no more, and no less."

In the Jarvis case, supra (l. c. 195), the Illinois Supreme Court said: "The question here is not, as assumed by appellant, whether the mill can be operated without the mill-pond, but whether the use of the mill-pond passed as a necessary appurtenant of the mill property. The deed or grant of conveyance need not contain the word 'appurtenance,' or similar expression, in order that appurtenances will pass thereby."

These cases define implied rights of the riparian owner, after severance, in an artificial lake. [Read v. Webster, 16 A. L. R. 1068, Annotation 1074-1077; Znamanacek v. Jelinek, 69 Neb. 110.]

In the Read case the court said (l. c. 1071) : "The implication of a reservation arises from the necessity of the easement to the reasonable use and enjoyment of the land reserved" . . . (citing cases) ; "that is to say, when there could be no other reasonable mode of enjoying the premises retained without the easement."

If an easement may be reserved by implication, for like reason it may be granted by implication.

From these authorities the plaintiff, the owner of the dominant estate, has a right to the maintenance of the dam, because when the Arcadia Club parted with the title, and when he acquired his prop-

erty, the lake was appurtenant and necessary to the proper enjoyment of his premises. The evidence shows that his property is practically worthless if the lake is empty, or if it is materially lowered from its original level. All the circumstances tend to show that the lake was intended to be permanent, and was so understood by plaintiff and defendants when they acquired their several properties. It was thrown open to the public; it was supplied with fish from the government and from the state; lots were sold adjacent, on the theory that the lake would be maintained. The defendants and the plaintiff built cabins, constructed other conveniences for pleasure seekers, so as to maintain resorts, which would be without value if the waters of the lake were drained. That the dam was to remain permanently while owne⸗ by the Arcadia Club, and afterwards, and when the parties acquired their property; that the lake was intended to be permanent; that it was necessary to any reasonable enjoyment of the property which the parties to this suit purchased and improved is not seriously disputed.

In 2 Farnham, Water and Water Rights, page 1495, this is said: "The same rights may be created by the sale of property with reference to an artificial lake as in case of a sale with reference to a platted highway. So, the raising of the level of a lake for the private benefit of the riparian owner will extend the public right of boating to the limits established by the higher level of the water."

III. The appellants say that in lowering the water they had no intention to drain the lake; they did it only for the purpose of making repairs. The trial court found otherwise; that the purpose of lowering the water was to prevent the plaintiff's use of the lake, and the evidence amply supports that finding. Even so, they stoutly assert their right to remove the dam if they see fit. They also assert their right to maintain the dam at its present height; the answer alleges that the lake is valuable to the plaintiff, that he has expended large sums of money on the same and the property adjoining it. While denying the plaintiff any right in the maintenance of the lake which, according to the evidence extended half its length over his land, defendants claim they can do as they please about it. If plaintiff desires the use of the lake the defendants may draw off the water and deprive him of that use; if he desires to use the soil for which his deed calls, defendants may flood it at will and defeat him there. If, as defendants assert, he bought only the land, it cannot be used for any purpose if defendants desire to prevent it. Such is the equity of defendants' asserted right.

Appellants overlook the principle of reciprocal easements. The court found, and the weight of evidence supports the finding, that a part of this dam was on plaintiff's land. If defendants are correct they had a right to destroy the dam by removing the part on their land, but the plaintiff had no right to destroy the lake by removing that part on his land. In their asserted right to maintain the lake on plaintiff's land, they deny plaintiff's reciprocal right to have it so maintained. In some cases cited, an owner of a mill may acquire a right to flood another's land without reciprocal right on the part of the person whose land is flooded. But in this case the value of the properties of both the plaintiff and the defendants depended upon the maintenance of the lake. The property passed from the original owner with use of the lake extending to all the land bordering upon it, and that use as fully attached to the land acquired by plaintiff as to that acquired by defendants.

In 3 Farnham, page 2398, section 819, it is said: "Adjoining landowners may, by mutual or joint action in creating a drainage system for their respective estates, establish reciprocal easements therein so that one cannot discontinue or interfere with the system without the consent of the others."

The text mentions the artifical system of reservoirs and canals for irrigation. Under the principle of reciprocal easements the upper owner cannot cut off the supply of the lower one. The text also points out that such reciprocal easements may be established by contract, and adds (l. c. 2399): "As will be seen in a subsequent section, when the owner of an estate divides it with an artificial arrangement of waterways existing at the time, the artificial ways become natural ones and will create reciprocal easements in favor of the owners of each parcel." Subsequent sections (pp. 2404-2405) mention specific cases.

On that principle, such an easement would accrue to the several owners of property abutting upon the artificial lake. It was intended to be permanent, and to all intents and purposes it was a natural lake. As long as it was maintained the soil beneath it could not be used for any purpose; the ownership of the land adjacent the lake determined the right to use the water of the lake for all purposes. Appellants cite authorities where the servient estate is subject to the easement of the dominant estate without any reciprocal right. Such authorities have no application here. The waters of the lake were as important and as convenient to anyone occupying the land at the upper end of the lake as to one at the lower end of the lake, and the right of the subsequent owner of the upper end was exactly the same as the right of the owner of the lower end. If the defendants had a right to remove the dam situated on their land,

then the plaintiff had an equal right to remove the portion of the dam on his land. If the defendants had a right to have the water maintained at the usual level, extending over the land of the defendants, the plaintiff certainly had the right to have it so maintained.

The question as to the reciprocal rights and obligations of the parties to maintain and repair the dam does not arise here, although defendant, Fred Klinhardt, said he did not want to help build up plaintiff's end of the dam.

IV. In order that a right of this character may arise by implication it is not necessary that it be acquired by direct conveyance from the common owner. It may be acquired by foreclosure of mortgage, by sheriff's deed, or by tax sale, or by any judicial proceeding. [Blum v. Weston, 102 Cal. 362; Damron v. Damron, 119 Ky. 806; Proudfoot v. Saffle, 62 W. Va. 51; Bean v. Bean, 128 N. W. (Mich.) 413.]

In the Michigan case (l. c. 419) the court said: "The rule that an easement or way by necessity will pass by implication, as well where the severance of the dominant and servient estates is effected by legal proceedings, as where the grant is voluntary, is generally recognized."

In 19 Corpus Juris, 925, the general rule is thus stated: "The method of alienation to create or transfer a right of way by necessity is not material."

The appellants assert that the foreclosure of the mortgage made by the Arcadia Country Club foreclosed any rights or easements which might otherwise have accrued to subsequent purchasers on a severance of the separate parts of the land, and cite McShane v. Moberly, 79 Mo. 41, in support of that contention. The court there held (l. c. 43) that the mortgagee was a purchaser for value, and acquired whatever right, title and estate the mortgagor had at the time of the execution of the mortgage. That is true enough, but the facts in this case show no such condition. The mortgage was made *after* the purchase of the land by the Arcadia Club, and after the improvements were placed on it. At least there was no evidence that the mortgage antedated the dam. On the facts admitted the burden was on defendants to prove the mortgage was prior to the erection of the dam. The natural inference from the proven facts is that the mortgage was made for the purpose of paying for that very improvement, and the mortgagee took the land burdened with the use to which the property was put on account of the improvements. The chief value of the property, and therefore of the security in the mortgagee, was in the dam and the artificial lake.

In this case the plaintiff and the defendants at first acquiesced in the situation and got along well until their disagreement about the respective claims of each in the use of the lake. There is no doubt, therefore, that the plaintiff, by implication, in the purchase of the property owned by him acquired the right to have the lake maintained at its usual level, and that the defendants had no right to lower the waters or drain the lake as they strenuously claim they have.

V. But the appellants claim that they at least had a right to put a fence across the lake on the proposed dividing line of their land and that of the plaintiff covered by the waters of the lake.

We have concluded that this artificial lake was intended to be permanent, such that the adjacent proprietors acquired riparian rights the same as if it were a natural body of water. As the situation stood at the time of the severance and at the time the plaintiff acquired his property, that property was useless to him without the privilege of the lake. Since the dam was at all times intended to be permanent, and the artificial lake a permanent body of water, the riparian rights of the plaintiff attached to it the same as if it were a natural lake. His right to have his patrons boat and fish upon the lake did not stop at the line which originally divided land owned by him from that of the defendants. There was no land and no line there when they acquired the property. It had been obliterated and covered by the waters of the permanent lake, and was so at the time of the severance.

The disorders, if any, claimed by defendants to have been committed by the plaintiff's guests have nothing to do with the merits of the cause. There are proper legal methods of dealing with such.

The judgment of the trial court enjoins defendants from molesting or interfering with plaintiff or his patrons "or the general public" in the free use of the lake. The "general public" is not made a party to the proceedings and the inclusion of the words "or the general public," where it occurs twice in the concluding part of the judgment, is error. This error we may correct by ordering here a modification of the judgment striking out such words. It is so ordered.

From the entire record it is apparent that the judgment is for the right party, and as modified it is accordingly affirmed. All concur.