**Anthony M. BRADLEY et al.,**
**Plaintiffs-Respondents,**

George L. Hilfinger et al., Intervenors-Respondents.

v.

**COUNTY OF JACKSON, Appellant.**

No. 48232.

Supreme Court of Missouri,

Division No. 2.

June 12, 1961.

Motion for Rehearing or for Transfer to Court en Banc Denied July 10, 1961.

James L. Williams, County Counselor, Gilbert R. Titus, Asst. County Counselor, Independence, for appellant.

Cornelius Costello, County Counselor, James C. Morris, Asst. County Counselor, Kansas City, for appellant.

Irving Achtenberg, Kansas City, for respondents; Achtenberg, Sandler & Balkin, Kansas City, of counsel.

EAGER, Judge.

The plaintiffs, as owners of lands surrounding Prairie Lee Lake in Jackson County, filed this declaratory judgment action seeking a construction of various conveyances and a declaration that they possess riparian rights in the lake, including the right to swim, boat and fish therein, to take water for domestic purposes, and to build private boat docks at the shore line. Chronologically, the history of the matter began in 1936 and 1937 when six property owners, Todd M. George, Solomon Wall, Edward Mathias, Emory Ritter and their respective wives, and Betty Winburn, a single woman, executed "Right of Way Conveyances" substantially similar in form to Jackson County; therein they did "remise, release and forever quit claim" certain lands for the creation of the lake, but in the bodies of the conveyances the grants were described as easements. The instruments were in some respects peculiar, but we regard them essentially as easements. Among other provisions were the following, which are typical: "That said easement covers only an easement for the building of the dam and taking care of the water, and the 150 feet for the building of the road and parking, and that there shall be no privileges for the building of places of amusement, stores, hot dog stands or the like, on said 150' and that only the owners of abutting property shall have the sole right to build boat docks. * * * This easement is granted, provided the project of building a lake has been completed within two years from date of this agreement. * * * To Have And To Hold the same, with all the rights, immunities, privileges and appurtenances thereto belonging unto the said party of the second part for the purposes of construction, and maintenance of a lake or reservoir on the said land herein conveyed, Forever." All of the grants except that of Callaway specifically required the completion of the roadway or the completion of the lake "project" within two years, upon penalty of a reverter.

Prior to the making of these grants, sundry negotiations took place between the property owners, representatives of the County (including County Judge Hostetter), an engineer for the Federal Government and others. The lake was built as a WPA project with federal money; delays ensued, and it was not completed until about 1943. It is clear from all the circumstances that the lake was intended to be permanent. The named grantors received no monetary consideration whatever. The County purchased an additional 20 acres upon which the dam was constructed, and some of the original grantors [1] assisted in that with contributions and otherwise. Mr. George platted all or part of his remaining land into approximately 80 lots, most of which faced the shore line, with the 150-foot strip intervening. The original plat was filed and approved by the County Court in or about August 1937. A reproduction of that plat is in evidence. Ritter and Callaway later platted all or parts of their remaining land; those plats are not in evidence. Ritter's plat was filed in July 1944. Twenty of the plaintiffs (individually or as husband and wife) purportedly own lots in George's Addition, one in Callaway Heights, and seven in Ritter's Subdivision. Several other parties were permitted to intervene as lot owners in Ritter's Subdivision or Callaway Heights.

When the lake project was started, it was soon found impracticable to build a road around the lake because of the terrain; it seems to be conceded by all that the 150-foot strip bordering the lake and intended as a road and parkway (50 feet in one instance) reverted to the original grantors. This was adjudicated by quiet title decrees for George (1946), Wall (1954), and Mathias (1948). The County Court entered an order for Callaway (1954) relinquishing and vacating all claims of the County above the contour line of the lake adjoining his property, which, of course, included the 50-foot strip grant-

ed by him for a road and parkway. Even prior to those recognitions of a reverter there seems to have been some apprehension that the original grants might have become invalid in toto for failure to fully perform; consequently, in 1944 the County procured from George, Ritter, Mathias and Gabriel (apparently the grantee of Callaway) so-called "Indentures" releasing and quitclaiming the submerged land included in the prior conveyances. Defendant contends that these conveyed the fee; plaintiffs assert that they were merely additional easements. These instruments contained a provision that the grantors "reserve all rights to erect boat docks for noncommercial purposes * * *"; and they also provided that the conveyances were made for the purpose of the construction, maintenance and operation of a lake or reservoir on the lands conveyed, forever, and that in the event the use of the lands as a lake or reservoir was ever abandoned or terminated, title should revert to the grantors, their heirs or assigns. Wall and Winburn did not execute such instruments.

Mr. George, one of the grantors, testified; much of his testimony was received over objection. That will be referred to later. He stated: that no consideration was paid for the deeds; that some of these grantors contributed to help buy the 20-acre dam site; that the WPA built the lake; that the instruments were drawn by an engineer in the County Surveyor's Office; that "we" built boat docks; that he platted his remaining property and sold 67 lots facing the lake, and that he put out a "brochure" (received in evidence) describing his addition and its benefits and restrictions; that his grantees of lots built docks and used the lake, when completed for boating and swimming; that docks were also built and the lake was used by purchasers of lots in Ritter's Subdivision and Callaway Heights; that a good many houses were built, all facing the lake; that the County did not interfere with the use of the

1. We shall hereafter use this term frequently as referring to the grantors in the original easements.

lake until "recent years" (apparently 1951), and that the values of all the lots would be considerably less if the lake privileges were not available to them. He further testified that he had to build a road back of the lots, and that he sold portions of the reverted perimeter strip to some lot owners; that there was originally a valley where the lake was built, with water from a number of springs forming two streams; that there was water "usually * * * the year round," and a swimming hole about 10 feet deep. Two lot owners testified that they had built homes, docks and walkways, had drawn water for domestic purposes, and had boated, fished and swum in the lake without interference until 1951; that at that time the County stopped them from swimming; that they had relied on these advantages in purchasing their lots; that the County had permitted or caused the lake level to drop so materially (and sometimes precipitately) as to affect their property and enjoyment seriously; also, that the water rights definitely affect the values of these properties. The County rents boats to the public from boat docks on its 20-acre tract. It contends that the use of the lake by so many lot owners seriously interferes with its use by the public.

The trial court found and adjudged that defendant owned the land under the lake in fee simple, that "plaintiffs are the owners of tracts of land which abut and adjoin the shore line of the lake * * * that by reason of such ownership, plaintiffs and each of them are riparian owners and as such are entitled to certain rights as riparian owners * * * including the right to swim, boat and fish in and on the waters of said lake, to take water therefrom for domestic use only, to skate and ride on ice formed thereon, to erect private boat docks and similar structures on said tracts of land at or near said shore line * * * but in no event * * * beyond and below said shore line * * * that defendant is not entitled to prohibit or interfere with the reasonable exercise of said riparian rights by plaintiffs and is not entitled to levy or collect license taxes, fees or charges for the exercise by plaintiffs of such rights."

Respondents have filed a motion to dismiss the appeal for the inadequacy of appellant's statement and also of its points and authorities, under Rule 83.05, V.A.M.R. Appellant was permitted to amend its brief after the motion was filed; it is still subject to criticism, but we overrule the motion to dismiss, partially in view of the public interest involved.

We have in mind the injunctions of Section 512.160 RSMo 1959, V.A.M.S., that "Unless justice requires otherwise the court shall dispose finally of the case on appeal * * *," and likewise of § 510.-310, applicable to nonjury cases, that "The judgment shall not be set aside unless clearly erroneous, * * *." However, we find ourselves unable on this record to determine the rights of all the parties, for reasons which we shall point out. The cause will be remanded, but we shall rule such matters as are sufficiently presented and which would aid in a final disposition.

Both parties consider the privileges involved here as "riparian" rights. It might be doubted whether they are strictly such in the technical sense (Indian Refining Co. v. Ambraw River Drainage Dist., District Court, D.C.E.D., 1 F.Supp. 937), but any difference would rest largely in terminology, so we pass that question. The original "right of way" conveyances from all owners contained the reservation that "only the owners of abutting property shall have the sole right to build boat docks." Considered in the light of all the surrounding circumstances (Van Deusen v. Ruth, 343 Mo. 1096, 125 S.W.2d 1; Bernero v. McFarland Real Estate Co., 134 Mo.App. 290, 114 S.W. 531; Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978), we hold that this reservation, although somewhat crudely expressed, constituted a reservation of the right to these grantors, respectively, and to their subsequent grantees to use the lake for the purposes for which such a lake would ordinarily be appro-

priate. The words "sole right" imply a prohibition against the building of docks by anyone but the abutting owners. The term "owners of abutting property" is significant, is general in character, and distinguishes this case from the case of Williams v. Diederich, 359 Mo. 683, 223 S.W.2d 402, where rights to boat and fish in a railroad reservoir were reserved to two persons designated as individuals by name. Here we construe the rights to be appurtenant, not in gross. This is said to depend mainly upon the nature of the right and the intention of the parties creating it, but a "water right or easement will ordinarily be presumed not to be in gross where it can fairly be construed to be appurtenant to some other estate." 56 Am.Jur. Waters, § 243, p. 701. See also, Engelhardt v. Gravens, Mo., 281 S.W. 715, 718. The reservation was concurrent with the grant to the County of the public rights and, in our opinion, subjected the lake itself to such appropriate burdens as were not inconsistent with the grants themselves. The Mayor and Council of the Borough of Spring Lake v. Polak (and Johnson), 77 N.J.Eq. 557, 78 A. 50, 51. The grantors did not limit their rights to the building of one boat dock for each tract. We note also that the grantors, being the owners of all the land, are considered as having retained all such rights and interests as were not expressly or by necessary implication conveyed. The easement of the public in the lake was not necessarily exclusive; rather, the contrary was indicated. See, generally, Campbell v. Kuhlmann, 39 Mo.App. 628, 630; State ex rel. Appel et ux. v. Hughes et al., 351 Mo. 488, 173 S.W.2d 45, 49. And, to the effect that it is not always necessary to use the words "heirs and assigns" in the conveyance or reservation of water rights in order to create an easement appurtenant, see, by analogy: 67 L.R.A. note 370–371; Kennedy v. Scovil, 12 Conn. 317, 325; Morse v. Aldrich, 19 Pick. 449, 454, 36 Mass. 449, 454. We further hold that the "sole right to build boat docks," as reasonably construed in the light of these circumstances, includes the right to boat, fish and swim

in the lake, and to use it further for such normal and legitimate purposes as the evidence shows were pursued here. By analogy, and as construing the terms of grants so as to include such rights as are reasonably necessary to the enjoyment of the property, see: The Mayor and Council of the Borough of Spring Lake v. Polak (and Johnson), 77 N.J.Eq. 557, 78 A. 50; Allen v. Wabash, St. Louis & P. R. Co., 84 Mo. 646. We note, as circumstances indicating the intention and effect heretofore suggested, that: there was no monetary consideration paid for any of these grants of easements of indefinite duration in very substantial tracts of land, nor was anything paid for the subsequent deeds; the lake was intended by all to be a permanent installation; the grantors were permitted to proceed immediately with the platting of lots fronting the lake and lot owners were permitted to build docks and use the lake as lots were sold. True, some of these things occurred after the grants were executed, but they constituted a chain of events related to the original intent and meaning of the conveyances. The oral testimony of Mr. George and of the lot owners was admissible in so far as it bore on the circumstances, as distinguished from conversations. We hold that those who received from the original grantors, directly or through mesne conveyances, land actually abutting the shore line of the lake acquired rights to use the lake for the controverted purposes, by express grant if so stated in the deeds, and by implication if not.

Before reaching the distinguishing problems, we note the case of Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978. There the ownership of the land surrounding a large artificial lake and dam had been separated into an upper and lower tract following foreclosure. Plaintiff at the upper end, and defendant at the lower, maintained commercial resorts and rented boats and cottages; it was also shown that the lake was "more or less" open to the public. Defendant insisted that plaintiff could not use the lower end of the lake and, owning

most of the dam, he purposely released enough water to leave plaintiff and his customers largely in the mud. In upholding plaintiff's riparian rights, the court there said in part, 9 S.W.2d loc. cit. 980–983: " 'Where the owner of land has, by any artificial arrangement, effected an advantage for one portion, to the burdening of the other, upon a severance of the ownership the holders of the two portions take them respectively charged with the servitude and entitled to the benefit openly and visibly attached at the time of the conveyance of the portion first granted.' Eliason v. Grove, 85 Md. 215, 36 A. 844; Smith v. Lockwood, 100 Minn. 221, 110 N.W. 980; Kahn v. Cherry, 131 Ark. 49, 198 S.W. 266; Jarvis v. Seele Milling Co., 173 Ill. 192, 50 N.E. 1044, 64 Am.St.Rep. 107; 19 C.J. 914. * * * It is not a question of prescription, but a question of the apparent attachment for the enjoyment of the property granted. It must be reasonably necessary for the enjoyment of the dominant estate. It must be apparent at the time of the severance by the original owner. The question is whether that principle can be applied to the facts in this case. * * * The right to the flow of a natural nonnavigable stream, in its natural way, applies to upper and lower owners of land across which the stream flows. That may apply with equal force to a stream diverted to an artificial channel. * * * In the Read Case [Read v. Webster] the court said (95 Vt. [239] 244, 113 A. [814] 816, 16 A.L.R. [1068] loc. cit. 1071): 'The implication of a reservation arises from the necessity of the easement to the reasonable use and enjoyment of the land reserved' (citing cases); 'that is to say, when there could be no other reasonable mode of enjoying the premises retained without the easement.' If an easement may be reserved by implication, for like reason it may be granted by implication. From these authorities the plaintiff, the owner of the dominant estate, has a right to the maintenance of the dam, because when the Arcadia Club parted with the title, and when he acquired his prop-

erty, the lake was appurtenant and necessary to the proper enjoyment of his premises. All the circumstances tend to show that the lake was intended to be permanent, and was so understood by plaintiff and defendants when they acquired their several properties. * * * There is no doubt, therefore, that the plaintiff, by implication, in the purchase of the property owned by him acquired the right to have the lake maintained at its usual level, and that the defendants had no right to lower the waters or drain the lake as they strenuously claim they have." The court also discussed the theory of reciprocal easements, which may have some application here. We realize that there are certain differences in the facts there from those in our case, but at least some of the principles stated are applicable. And see, generally, Dardenne Realty Co. v. Abeken, 232 Mo. App. 945, 106 S.W.2d 966.

The parties disagree as to the effect of the 1944 "Indentures," or quitclaims. Defendant insists that they conveyed the fee, subject to reverter if the lake project was abandoned. Plaintiffs claim that they were only additional easements. We find it unnecessary to decide that question. If those deeds conveyed the fee subject to reverter, they still conveyed only the submerged land and the abutting owners retained whatever riparian rights they had, either by express reservation or as reasonably implied. See, again, Greisinger, supra. Riparian rights come from the ownership of land *abutting* the water, and arise as an incident of the ownership of the "upland," regardless of the ownership of the submerged land. Johnson v. May, 189 App.Div. 196, 178 N.Y.S. 742, 748; Trustees, etc., of Town of Brookhaven v. Smith, 188 N.Y. 74, 80 N.E. 665, 9 L.R.A., N.S., 326. We hold that if a severance of the fee took place in 1944, still the ownership of the submerged land and lake was charged with such servitude as was reasonably necessary to the enjoyment of the *abutting* property. Apparently, the lake

was then being used by certain abutting landowners. We also note that all the deeds of 1944 reserved the right "to erect boat docks for non-commercial purposes," thus expressly reinforcing such riparian rights as would otherwise pass by implication. At that time one plat had been filed and approved, and another was under consideration. The 1944 deeds did not destroy the rights of *abutting* owners.

█ Ordinarily, an indispenable requisite of the doctrine of riparian rights is "actual contact of the land and the water." Stratbucker v. Junge, 153 Neb. 885, 46 N. W.2d 486, 488; Young v. City of Asheville, 241 N.C. 618, 86 S.E.2d 408. Or, as is said somewhat more liberally in the Restatement of Torts, § 843, p. 327: " 'Land is riparian by virtue of the fact that it is so located in respect to a watercourse or lake that the possessor of it has lawful access to the water for his private use. The mere fact that a parcel of land is close by or adjacent to the water does not make that land riparian when the water itself is on another's land, for in such case there is no access to the water, for private use at least, without intruding on the land on which the water lies.' " That statement must, we think, be accepted with some qualification and considered along with the context of the whole section. It has, however, been held that an owner of a tract of land abutting the water and possessing riparian rights may convey riparian rights to the owner of a non-abutting part of the tract along with a conveyance of that part of the land. This, it is said, is simply a "preservation of the right which the land has at the time of the conveyance * * *." Strong v. Baldwin, 154 Cal. 150, 97 P. 178, 181. The application of this principle should depend somewhat on all the attending circumstances. Here, from a practical standpoint, the lots were platted as lakeside lots; they all fronted the lake; a strip, intended for use as a perimeter road and parkway, was granted by easement to the County, but with the very apparent intention of permitting access across it to the lake from all the adjoining property. The easement in this strip terminated and the full fee ownership therein reverted to the original landowners except in so far as the fee or easements in parts thereof may have been conveyed by them to lot owners. There is nothing of record to show its dedication to the use of the public or any general easement to lot owners, either as a parkway or otherwise. In Dowd v. Lake Sites, Inc., 365 Mo. 83, 276 S.W.2d 108, there was a reserved parkway between the platted lots and the lake, but all lot owners had been given expressly the use of the lake *and the parkway*. We hold that, under the circumstances of the present case, those lots (technically, the. owners thereof) in which the fee ownership extends to the shore line, or to which the privileges of the use of the lake have been expressly granted by instruments emanating from one of the original fee owners of the strip, or to which rights of ingress and egress over the strip have been expressly granted by any such fee owner for the purpose of using the lake, are entitled to and possess the controverted riparian rights. In so holding we have considered the reservations made and what we deem to have been the intent of the original parties. We have considered all of the authorities cited by defendant, including fifteen quotations from Corpus Juris Secundum, but they do not persuade us that the conclusions heretofore stated are unsound under our facts.

We are dealing here with a situation wholly different from one where the lot owners own the fee in an adjoining strip in which an outstanding easement exists, as for a road. Tolchester Beach Improvement Co. v. Boyd, 161 Md. 269, 156 A. 795, 81 A.L.R. 895; Indianapolis Water Co. v. American Strawboard Co., C.C., 53 F. 970. Here the original easements have terminated and the full fee has revested, and only a few of the lot owners appear to own any land in the strip. We also note at this point that no express order of reverter appears in the record as to the Ritter road and parkway strip; under the circum-

stances, however, we are impelled to hold that the County has abandoned and relinquished all interest therein as it has expressly done in at least one other instance, and we treat that part of the strip as we do the others.

■ We have disregarded entirely the oral testimony of conversations between Mr. George and Judge Hostetter concerning the rights and privileges which would be vested in the landowners. We have done so not because of the asserted objection based on the Dead Man's Statute, for Hostetter was not himself a party to the contract. The real point is that Hostetter, speaking individually, could not bind the County Court by any expressions of intention or by agreements not shown by official order or in the instruments of conveyance. If a part of the evidence is incompetent, we need not consider it. This, however, neither precludes nor diminishes the value of oral testimony concerning the attendant circumstances.

The specific difficulties here arise from deficiencies in the trial record. Plaintiffs offered, and the court received, subject to somewhat uncertain reserved objections, the lengthy certificate of an abstractor purporting to show, in skeleton form, the immediate conveyance to each of the plaintiffs. It is difficult to determine whether this exhibit was received by agreement or not, but probably it was. We shall assume that it is in evidence, for whatever it is worth. We now review briefly the evidence as to the status of the lots in the different additions. We note at this point, however, that this controversy is between lot owners (and some original grantors) and the County. If it were between the lot owners and the original grantors, it is possible that the situation would be different. Eidelbach v. Davis, Tex.Civ.App., 99 S.W.2d 1067. We first consider George's Addition: many of the lots are merely shown to have been conveyed to the present owners by lot numbers by *intermediate* holders with "boat and dock privileges on

shore line * * *," but with no conveyance shown from George, either of such rights or of the adjoining land in the intervening strip. These conveyances are dated from 1951 to 1959, inclusive, all being made after the reverter of the strip to George; approximately seven deeds are from George, with such rights included, all executed in 1948 or later. The latter owners would, under our present ruling, possess the rights, as would also any to whom George has conveyed the pro rata part of the fee in the strip. The status of the rights of the lot owners whose titles, as shown, are merely from intermediate owners must be developed further, tracing their rights, if any, from an origin in George's title. In some instances attempts have been made by intermediate owners to convey land to the lake itself, but with no conveyance shown from George; and in some instances the ownerships claimed in the petition do not correspond with the last conveyances as shown in the certificate.

The conveyances shown in Callaway Heights are all from intermediate owners, they are by lot numbers, and they contain no grants of rights. That plat is not in evidence, and we are wholly unable to determine what rights, if any, such parties have.

In Ritter's Subdivision the lots have been conveyed by the original grantor. In various instances he has attempted to convey the land to the shore line; in so far as this may have been accomplished, the lot owners possess rights in the lake. In one or more instances Ritter has conveyed "boat and dock privileges"; in some, the deeds merely refer to the lot as "adjoining Prairie Lee Lake," which, if not true in fact, is insufficient to convey any rights in the lake. The plat is not here. A long reference to the plat, on pages 14 and 15 of the certificate with quotations referring to "Parts Conveyed Off" is wholly meaningless without further explanation.

The properties now purporting to be owned by Mathias, Randall, Wall, George,

Bachrach and Achtenberg present no difficulties in so far as they *abut the shoreline*. We have no plats except that of George, and the other tracts are described merely by metes and bounds. No conveyances whatever are shown to certain of the intervenors. Since the cause is being remanded, the court may, upon retrial, untangle the confused status of all these lots and tracts and determine which have rights in the lake, in the light of our present rulings. Nothing which we have said in this opinion is to be taken as an adjudication of title to any of the land involved. This is not a suit to try title. It follows from what we have said that the County is not entitled to exact a fee from any land owner who is found to possess riparian rights in the lake.

It would be wholly incongruous for us to adjudicate the rights of some of these parties and leave the status of others dangling in the air,—or perhaps in the water. The judgment is reversed and the cause is remanded in order that the trial court may adjudicate the rights of all in accordance with the principles we have declared and upon a fuller and more intelligent development of the evidence.

All concur.