

# SUPREME COURT OF MISSOURI
## en banc

INCLINE VILLAGE BOARD )        *Opinion issued April 30, 2019*
OF TRUSTEES, )
                     )
       **Respondent,** )
                     )
**vs.** )         **No. SC97345**
                     )
**MATTHEW F. EDLER and** )
**ANDREA EDLER,** )
                     )
       **Appellants.** )

### APPEAL FROM THE CIRCUIT COURT OF ST. CHARLES COUNTY
**The Honorable Daniel G. Pelikan, Judge**

Mathew and Andrea Edler appeal from a judgment ordering them to remove a dock they built on a lake that abuts their home but that is owned by a neighboring subdivision. Although Missouri recognizes riparian rights for properties abutting natural bodies of water, this lake is artificial, as it was built by the founder of the adjoining subdivision and has since been maintained by the owners of properties in that subdivision. The Edlers have never had the right to use the lake based on their ownership of the abutting land, nor have they otherwise established an easement for use of the lake. In the absence of such an easement, they did not acquire riparian rights in the lake. The judgment directing them to

remove the dock is affirmed. The award of attorney's fees to the trustees is reversed as no special circumstances justifying such an award were shown.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The circuit court made findings of fact based on a stipulation of the parties as supplemented by limited additional testimony. Neither party challenges these findings on appeal. It found that, in 1974, Sherwood Builders, Inc., built the subdivision Incline Village in St. Charles County. As an amenity for Incline Village, Sherwood dammed a creek and created a man-made lake called Main Lake (but in some documents referred to as Incline Village Lake). Incline Village subdivision surrounds only a portion of Main Lake. Land not owned by Incline Village abuts other portions of Main Lake. The lakebed itself, however, is entirely within Incline Village, and it is conceded no properties outside Incline Village have any ownership interest in the lakebed.

Sherwood Builders also established an "Indenture of Trust and Restrictions of Incline Village," which created a board of trustees ("trustees") tasked with maintaining Main Lake, collecting assessments for its upkeep, and enforcing certain restrictions on its use. Among other provisions, the indenture provided:

> No structures or other improvements shall be made on or to any common area, including any body of water, other than such structures or improvements which are made by the trustees for the benefit of all lot owners. Except that, the owner of each lot which abuts any body of water, may construct one boat dock on such body of water, provided that, said boat dock extends from said lot and is first approved in writing by the trustees.

2

Although this provision prohibits the Incline Village lot owners whose properties do not abut Main Lake from building docks on the lake, all Incline Village lot owners otherwise have the right "to the exclusive use and benefit" of Main Lake.

In 1996, Sherwood Builders conveyed all the land on which Incline Village sat, including the Main Lake lakebed, to the trustees. That year, a circuit court ordered Incline Village lot owners to begin paying a "special assessment" of $415 per year for five years to fund the improvement of Main Lake. The court also ordered the lot owners to pay an annual assessment fee of $100 for a "preventative and remedial maintenance program" over the life of Main Lake. In 2012, the trustees entered into a class action settlement with the Incline Village lot owners that raised the minimum per-year assessment fees to $495 in addition to the special assessment. The trustees used the money from these assessments to dredge excess silt from the lakebed and to heighten the dam. Through these assessments, to date, the trustees have spent approximately $2.864 million in maintaining Main Lake.

In 1997, Peter Lenzenhuber began acquiring property that abuts portions of Main Lake but is not a part of Incline Village. The lots on this property became part of Sumac Ridge subdivision. The circuit court found Lenzenhuber had decided, "based on the cost of joining Incline Village … and the potential future liabilities associated with the lake at Incline Village, I see no reason to have Sumac Ridge join Incline Village. … Purchasers of Sumac Ridge are aware that the lake is owned by Incline Village Trustees." Accordingly, Lenzenhuber's deed, which includes the lot the Edlers eventually purchased, specifically states the transfer is of certain described property but "EXCEPTING THEREFROM those parts conveyed to the Trustees of Incline Village by deeds recorded

in Book 1099 page 25 end Book 1237 page 55 of the St. Charles County records" and "EXCEPTING THEREFROM the following: INCLINE VILLAGE LAKE."

Matthew and Andrea Edler own a home and another lot in the Incline Village subdivision, neither of which abuts Main Lake, as well as the lot they purchased in the Sumac Ridge subdivision that abuts Main Lake. The Edlers pay the annual assessment on their Incline Village property to maintain Main Lake and, in accordance with the express terms of the Incline Village indenture, have the right to Main Lake's "exclusive use and benefit." But, as the Edlers admit, the indenture explicitly does not allow them to build a dock because their Incline Village property does not abut Main Lake, and the original documents transmitting property that included their lot in Sumac Ridge expressly excluded transfer of any rights to the lake. The circuit court found the Edlers' own deed is silent about any right to use Main Lake.

The circuit court found at least one of the trustees had told the Edlers they could not build a dock on Main Lake before construction began, and the parties stipulated the trustees objected to the building of the dock. The Edlers, nonetheless, constructed a floating dock on Main Lake at the point where their Sumac Ridge lot abuts the lake. The Incline Village trustees brought suit seeking a declaratory judgment, damages for trespass, and the removal of the dock.

Based on the parties' joint stipulation of material facts as supplemented by limited additional testimony, the circuit court ruled in favor of the trustees. It held the Edlers had no riparian rights to Main Lake from their ownership of the Sumac Ridge lot, and the Edlers' construction of the boat dock on Main Lake was an unauthorized use of the trustees'

4

property. It ordered removal of the dock. It also found special circumstances existed

supporting the award of attorney's fees of $70,000 in favor of the trustees because "the

Defendants' built their dock on Plaintiffs' property without seeking permission from the

Plaintiff and after having been told by Plaintiff that the Defendants did not have the right

to build on Plaintiffs property." The Edlers appeal.

## II.    STANDARD OF REVIEW

Because the parties submitted a joint stipulation of material facts, "the only question

before this court is whether the trial court drew the proper legal conclusions from the facts

stipulated." *Schroeder v. Horack, 592 S.W.2d 742, 744 (Mo. banc 1979)* (internal

quotation omitted). This Court reviews determinations of law *de novo. ITT Commercial

Finance Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993)*.[1]

## III.    THE EDLERS DO NOT HAVE RIPARIAN RIGHTS TO USE MAIN LAKE BECAUSE IT IS AN ARTIFICIAL LAKE AND THEY HAVE NO OWNERSHIP OR EASEMENT RIGHTS TO ITS USE

A riparian right is "[t]he right of a landowner whose property borders on a body of

water or watercourse. Such a landowner traditionally has the right to make reasonable use

of the water." *Riparian Right, Black's Law Dictionary (10th ed. 2014); Bollinger v. Henry,

375 S.W.2d 161, 166 (Mo. 1964)*. Generally, riparian rights arise naturally as an incident

of owning land that abuts a body of water. "In all states where the common law has not

been changed, the owners of land abutting on bodies of water are accorded certain rights

---

[1] While a few of the circuit court's findings differ slightly from the stipulation, presumably based on the testimony given as a supplement to the stipulation, there is no contention that the record does not support the circuit court's factual findings.

by reason of their adjacency which are different from those belonging to the public generally, and are comprehended within the general term 'riparian rights.'" *1 Henry Philip Farnham, Law of Waters and Water Rights, 278 (1904).*

In accord with these principles, this Court has held "[r]iparian rights come from the ownership of land *abutting* the water, and arise as an incident of the ownership of the 'upland,' regardless of the ownership of the submerged land." *Bradley v. Cnty. of Jackson, 347 S.W.2d 683, 688 (Mo. 1961); accord Edmondson v. Edwards, 111 S.W.3d 906, 909 (Mo. App. 2003)* ("A riparian owner is an owner of land bounded by a watercourse or through which a stream flows") (internal quotations omitted). The common law in Missouri and elsewhere draws a distinction between land abutting natural bodies of water and land abutting artificial bodies of water when determining whether riparian rights exist, however. [2]

For instance, Farnham's treatise on water rights states:

> Rights may be acquired in an artificial condition of water in the same way that they can be acquired in real estate generally. This may be by grant, contract, express or implied, or by prescription. … Of course, the principles by which the rights in this kind of water courses are governed are entirely different from those governing natural water courses. In the latter, as has been seen, the right is given by nature, and the riparian owner has a right to enjoy it as it flows along, and he loses none of his rights by mere nonuser. *In case of the artificial course, however, there is no natural right to it. It must originate in grant, contract, or prescription*, and the rules governing its

---

[2] The term "riparian rights" is technically incorrect in the context of lakes. The English word "riparian" derives from the Latin *ripa*, meaning the bank of a stream. *Webster's Third New International Dictionary, 1960 (2002)*. The proper term here would be "littoral rights," because the English word "littoral" derives from the Latin *littus*, meaning the shore of a lake or ocean. *Id. at 1323*. But the term "riparian rights" has come to include the rights of landowners to all bodies of water, and the Court will use it here.

acquisition and loss are similar to those governing other artificial uses of property. The right to the water course is a proper subject-matter for contract.

*Farnham, supra, at 2407-08* (emphasis added).

*Bollinger* noted, "As a general rule riparian rights do not ordinarily attach to artificial streams in artificial channels." *375 S.W.2d at 166.* This distinction rests at least in part on the need to maintain artificial bodies of water:

> Because the construction of a man-made water body often involves the expenditure of substantial sums of money and the expense is not, as a rule, divided proportionately among the various abutting owners, the individual making the expenditure is justified in expecting that superior privileges will inure to him in return for his investment. In contrast, the abutting owners to a natural water body probably invest proportionally equal amounts for the increased value of the water front property.

*Anderson v. Bell, 433 So.2d 1202, 1205 (Fla. 1983).* The monies expended by the Incline Village lot owners on the maintenance of Main Lake provide a good example of such expenditures by original abutting owners.

Missouri, like some other states, does permit landowners whose properties abut artificial bodies of water to gain riparian rights when the landowner obtains an easement that permits use of the water. Various types of easements have been recognized in prior Missouri cases as sufficient to give the abutting owner such rights. For example, *Allee v. Kirk, 602 S.W.2d 922 (Mo. App. 1980),* recognized an easement by estoppel to build a dock on a lake, and *Dardenne Realty Co. v. Abeken, 106 S.W.2d 966 (Mo. App. 1937),* and *Ranney v. St. Louis & San Francisco Railroad Co., 119 S.W. 484 (Mo. App. 1909),* recognized easements by prescription.

7

The Edlers recognize these longstanding principles of law and admit riparian rights would not typically arise from their owning land abutting Main Lake, as it is an artificial lake. They also recognize they do not have an easement in Main Lake and so the easement exception does not assist them. They contend, nonetheless, they have acquired riparian rights in Main Lake because it is a permanent addition to the land. Citing *Greisinger v. Klinhardt, 9 S.W.2d 978 (Mo. 1928)*, they assert riparian rights come with permanence. The Edlers' position is incorrect for two reasons.

First, were this Court to recognize an exception to the common law for permanent, artificial bodies of water, it would have to do so here for the first time, for *Greisinger* does *not* hold that an artificial lake that has become permanent should be treated as if it were a natural lake for the purpose of determining whether its abutting landowners have riparian rights. Rather, *Greisinger* held both the plaintiff and defendants had acquired riparian rights through a theory of *implied reciprocal easements. Id. at 983.*

In *Greisinger*, the Arcadia Country Club dammed a creek on its land, creating an artificial lake named Lake Killarney. *Id. at 979.* The club later defaulted and the property was divided into two lots, each abutting half of the lake. *Id.* The plaintiff and defendants each purchased one of the lots and used its portion of Lake Killarney to operate separate recreational resorts, which included boating, swimming, and fishing on the lake. *Id.* Eventually, the defendants, who owned the deeper portion of the lake around the dam, stretched a wire across the lake on what they believed to be their property line and began letting water out of the dam, leaving plaintiff's portion shallow and unusable. *Id. at 980.*

8

*Greisinger* held both parties had riparian rights to Lake Killarney via implied reciprocal easements because the single plot of land was later divided into two:

> Where the owner of land has, by any artificial arrangement, effected an advantage for one portion, to the burdening of the other, upon a severance of the ownership the holders of the two portions take them respectively charged with the servitude and entitled to the benefit openly and visibly attached at the time of the conveyance of the portion first granted.

> That principle applies to ways, lateral support, and riparian rights.

*Id*. (internal citation and quotation omitted). This Court further noted the non-dominant property was "practically worthless if the lake is empty, or if it is materially lowered from its original level. All the circumstances tend to show that the lake was intended to be permanent, and was so understood by plaintiff and defendants when they acquired their several properties." *Id*. *at 981*.

The Edlers take *Greisinger*'s reference to the "permanent" character of the lake to mean *Greisinger* established a "permanent becomes natural" exception in Missouri, by which an artificial lake, if permanent, may be legally treated as a natural body of water for determining riparian rights. But permanence was simply a factor in *Greisinger*'s analysis of whether an implied reciprocal easement in the lake was created due to the original owner's undivided use of the lake before severance and the parties' expectations the lake would always exist for their use at their time of purchase. As *Greisinger* put it, "The implication of a reservation arises from the necessity of the easement to the reasonable use and enjoyment of the land reserved … that is to say, when there could be no other reasonable mode of enjoying the premises retained without the easement." *Id*. (internal quotation omitted). This Court did not recognize a "permanent becomes natural" exception

9

to the general rule that artificial bodies of water do not give abutting owners riparian rights.[3]

Second, even the authorities the Edlers claim support a "permanent becomes natural" exception would not find the Edlers qualify for the exception. The primary proponent of such an exception is a 1951 law review article, *Alvin E. Evans, Riparian Rights in Artificial Lakes and Streams*, 16 MO. L. REV. 93 (1951). This article was written long after *Greisinger* and did not suggest mere permanence of an artificial body of water should cause it to be treated as natural. Rather, it addressed a common situation in which landowners whose property abuts an artificial body of water have relied on the water's use and permanence for a lengthy period.[4] In such cases, it said, the permanent body of water should be treated as natural. *Id. at 113.* But the article concedes there are other solutions to this problem, including the application of implied easements, for which it cites, among

---

[3] Similarly, *Bradley*, the other Missouri case cited by the Edlers, does not assist their argument. While *Bradley* said abutting landowners continued to have riparian rights after they conveyed the lakebed to a public entity, the Edlers fail to note the landowners there reserved the right to use the lake in their conveyance. *347 S.W.2d at 685.*

[4] The article begins by posing the following scenario:

> An owner of land bordering on a stream or lake finds it to his advantage to erect a dam and flood the lands above. For present purposes let it be assumed that he meets with no resistance and in time acquires by adverse user [sic] the right to the flowage over the lands in question. One important consequence often is that the upper owners of the lands so overflowed make use of the raised level of the water and build summer cottages, around the lake so formed, or use it for the creation of summer pleasure resorts, boating and other things. Based on what theory may they claim a continuance of this situation?

*Evans, supra, at 93* (internal citation omitted).

other cases, *Greisinger. Id. at 98-99.* Cases decided since the article was written also impose other requirements besides permanence. *See, e.g., Alderson v. Fatlan, 898 N.E.2d 595, 602 (Ill. 2008)* (in addition to permanence, as "a minimum requirement" a court will require a showing "the party invoking the rule has relied upon use of the artificial body of water without dispute for a lengthy period of time"); *accord United States v. 1,629.6 Acres of Land, More or Less, in Sussex Cnty., Del., 503 F.2d 764, 768 (3d Cir. 1974).*[5]

The Edlers cannot claim they have relied on use of Main Lake for a lengthy period, as the Edlers have never had use of the lake for dock purposes or paid assessments for its maintenance in their capacity as owners of a property in Sumac Ridge. In fact, the record shows the predecessor in title's deed for Sumac Ridge explicitly excepts Main Lake from the transfer. Rather, it is the residents of Incline Village who have spent millions of dollars to maintain Main Lake's condition as an artificial lake. The Edlers urge Main Lake should be treated as natural, but it is not a natural lake, and it could not continue its current use were the trustees to stop dredging silt from the lake or allow the dam to fall into disrepair. Further, the circuit court found at least one trustee made the Edlers aware of the restrictions contained in the Incline Village indenture before they installed their dock. Even were

---

[5] *Cf. Ramada Inns, Inc. v. Salt River Valley Water Users' Ass'n, 523 P.2d 496, 498 (Ariz. 1974)* (question is whether the artificial body of water "has developed the characteristics of a natural watercourse"); *Chowchilla Farms v. Martin, 25 P.2d 435, 442 (Cal. 1933); Law of Water Rights and Resources, § 3:26 Artificial watercourses—Conversion of natural to artificial watercourse; 78 Am. Jur. 2d Waters § 45 (2013).* At least one court has followed a prescriptive easement theory but that, of course, would require a non-contested claim of right for the prescriptive period. *Falcon v. Boyer, 142 N.W. 427, 429 (Iowa 1913).*

11

Missouri to recognize a "permanent becomes natural" exception – and it does not do so – the Edlers would not qualify for it.

## IV.   THE CIRCUIT COURT ERRED IN AWARDING THE TRUSTEES ATTORNEY'S FEES BECAUSE THERE WERE NO SPECIAL CIRCUMSTANCES

In considering a request for attorney's fees, "Missouri has adopted the American Rule; that is, absent statutory authorization or contractual agreement, with few exceptions, each litigant must bear his own attorney's fee." *David Ranken, Jr. Tech. Inst. v. Boykins, 816 S.W.2d 189, 193 (Mo. banc 1991), overruled on other grounds by Alumax Foils, Inc. v. City of St. Louis, 939 S.W.2d 907, 911 (Mo. banc 1997).* The trustees argue the circuit court, nonetheless, properly awarded them attorney's fees because fees are allowed as costs under section 527.100[6] in declaratory judgment actions when "special circumstances" are shown. They allege the Edlers intentionally built their dock knowing they had no right to do so and this constitutes a special circumstance.

The trustees are correct that section 527.100 permits the recovery of costs in declaratory judgment actions. While those costs do not automatically include attorney's fees, a court has discretion to award such fees as costs if "special circumstances" are shown. *Smith v. City of St. Louis, 395 S.W.3d 20, 26 (Mo. banc 2013).*

Although Missouri courts "narrowly construe" what constitutes a special circumstance for the purpose of awarding attorney's fees, "intentional misconduct is a 'special circumstance' that may justify an award of attorney's fees." *Tupper v. City of St.*

---

[6] All statutory references are to RSMo 2000.

*Louis, 468 S.W.3d 360, 374 (Mo. banc 2015)*. For example, *Klinkerfuss v. Cronin, 289 S.W.3d 607, 617 (Mo. App. 2009)*, found special circumstances when a beneficiary brought litigation to remove a trustee and the court found the litigation was "groundless and unsuccessful" and initiated "with the sole purpose of benefitting the beneficiary." [7]

On the other hand, "[a]dvocating inconsistent positions is not a special circumstance; it is the very nature of litigation." *Smith, 395 S.W.3d at 26.* For that reason, *Smith* refused to permit an award of attorney's fees against the city of St. Louis when the plaintiffs alleged St. Louis failed to comply with statutory requirements for a redevelopment plan. *Id.* Similarly, *Ranken* held fees were not authorized where an erroneous attempt to assess a tax "was not frivolous, nor was it without substantial legal grounds. There was no evidence that this was a reckless and punitive assessment of the license tax." *816 S.W.2d at 193; see also Windsor, 24 S.W.3d at 156* (no special circumstances shown when insurer merely filed interpleader to determine its liability).

The trustees argue the Edlers' intentional trespass necessitating this suit constitutes "special circumstances" that warrant an award of attorney's fees. But, the circuit court did

---

[7] *Klinkerfuss* cites *Goellner v. Goellner Printing, 226 S.W.3d 176, 179 (Mo. App. 2007)* (defendant intentionally ceased paying 92-year-old woman's health insurance out of spite), *Volk Construction Co. v. Wilmescherr Drusch Roofing Co., 58 S.W.3d 897, 901 (Mo. App. 2001)* (defendants intentionally defrauded creditors), and *Temple Stephens Co. v. Westenhaver, 776 S.W.2d 438, 443 (Mo. App. 1989)* (defendant intentionally omitted neighboring property from rezoning application because owner opposed the zoning change). Other situations which have been found to constitute "'special' or 'very unusual' circumstances … include … an action brought by an estate beneficiary who has successfully brought litigation beneficial to the estate as a whole; and an action where a litigant has successfully created, increased, or preserved a fund in which non-litigants were entitled to share." *Windsor Ins. Co. v. Lucas, 24 S.W.3d 151, 156 (Mo. App. 2000)*.

13

not find the Edlers engaged in an intentional trespass knowing they had no right to build the dock, or that the Edlers acted in bad faith or out of spite. Its findings of fact stated only that the Edlers' deed did not mention the lake, the Edlers "did not seek permission from the Incline Village Subdivision Trustees to build their dock[,]" and "[a]t least one of the Trustees told the Edlers they were not allowed to build a dock on the Lake prior to the construction of the dock." Similarly, the circuit court's conclusions of law merely stated in support of its award of fees that the Edlers committed a trespass, but not that they were aware their claim had no merit or was brought in bad faith:

> The special circumstances in this case are the Defendants' trespassing onto Plaintiff's property and the fact that the Defendants' built their dock on Plaintiffs' property without seeking permission from the Plaintiff and after having been told by Plaintiff that the Defendants did not have the right to build on Plaintiff's property. (See *Ellis v. Hehner*, 448 S.W.3d 320 (Mo. App. ED 2014).

The circuit court nonetheless concluded this case was like *Klinkerfuss* and merited the award of attorney's fees due to special circumstances. This was error.

The Edlers' actions are much more comparable to those in *Smith* and *Ranken* than to *Klinkerfuss*. The Edlers' defenses were not frivolous or offered out of spite, malice, or with knowledge they had no basis. While an individual trustee told the Edlers they could not build the dock, they received no formal written denial of permission from the board of trustees. Further, the Edlers consulted an attorney and believed (wrongly), based on his advice, that they had riparian rights in the lake and could build the dock even without permission. To have done so was risky, and costly, for the Edlers. But, as the circuit court itself stated:

14

The Court concludes that there is little authority in Missouri directly on point with regard to the specific facts of this case. The Court further concludes that where there is a paucity of law on an issue in the State of Missouri, the Court can look to decisions in other state courts, learned treatises and other secondary sources….

While this Court has held Missouri law does not support the existence of riparian rights or the Edlers' attorney's theory of "permanent becomes natural," every case has at least one party who does not prevail. There is no showing the Edlers did not think they were arguing for a good faith application or extension of existing law. "Special circumstances" contemplates something more than advocating a position a court finds wrong. Special circumstances are not shown here.

## V.   CONCLUSION

The law flows like water, down the path of least resistance. The Edlers request this Court flow uphill in adopting an unnecessary exception when longstanding Missouri easement law suffices. This Court declines to adopt such an exception and holds the established common law applies, denying riparian rights to landowners abutting artificial bodies of water. The circuit court's order directing the Edlers to remove their dock is affirmed. But the circuit court erred in finding "special circumstances" supporting the award of attorney's fees to the trustees. That portion of the judgment is reversed.

_____
**LAURA DENVIR STITH, JUDGE**

All concur.

15